CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
GALLUP, CHIARELLA, and MAGGS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist SABRINA D. HARMAN**
**United States Army, Appellant**

ARMY 20050597

Headquarters, III Corps and Fort Hood
James A. Pohl, Military Judge
Colonel Clyde J. Tate, II, Staff Judge Advocate (pretrial)
Colonel Mark Cremin, Staff Judge Advocate (post-trial)

For Appellant:  Frank J. Spinner, Esq. (argued); Captain Seth A. Director, JA; Frank J. Spinner, Esq. (on brief).

For Appellee:  Captain Teresa T. Phelps, JA (argued); Major Elizabeth G. Marotta, JA; Major Tami L. Dillahunt, JA; Captain Teresa T. Phelps, JA (on brief)

30 June 2008*

--------------------------------------------------------
OPINION OF THE COURT
--------------------------------------------------------

MAGGS, Judge:

Contrary to her pleas, a panel composed of enlisted and officer members convicted appellant of conspiracy to maltreat detainees, dereliction of duty by willfully failing to protect detainees from abuse, and maltreatment of detainees (four specifications), in violation of Articles 81, 92, and 93, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 893 [hereinafter UCMJ].  The panel sentenced appellant to reduction to Private E1, forfeiture of all pay and allowances, confinement for six months, and a bad-conduct discharge.  The military judge credited appellant with 51 days towards her sentence of confinement because of illegal pretrial punishment.  The convening authority approved only so much of the sentence as provides for reduction to Private E1, confinement for six months, forfeiture of all pay and allowances for six months, and thereafter forfeiture of $1,092.00 per month until the date the discharge is ordered executed, and a bad-conduct discharge.  The convening authority also credited appellant with 51 days of

*Corrected

confinement credit against the sentence to confinement. In our decretal paragraph, we amend the specification of one charge, but otherwise affirm the approved findings and sentence.

## I. FACTS

Appellant was a member of the 372nd Military Police Company, a reserve unit headquartered in Maryland. In May 2003, she deployed with the 372nd to Iraq. In August 2003, her unit assumed duties at the Baghdad Central Confinement Facility at Abu Ghraib, Iraq. At Abu Ghraib, appellant served as a guard in a prison structure called "Tier 1" (also known as "the hard site," to distinguish it from tent encampments holding other prisoners).

The charges in this case arise out of three incidents that occurred in Tier 1 during the fall of 2003. Evidence concerning these incidents comes principally from the testimony of the soldiers involved, from witnesses not implicated in the incidents, from photographs and video recordings made during the incidents, from two sworn statements that appellant made to investigators, and from a letter that appellant wrote on 20 October 2003 to her former roommate in the United States.

### The Incident of 25 October 2003

The record contains evidence that, on 25 October 2003, several military policemen (MPs) from the 372nd took it upon themselves to "punish" three Iraqi detainees who allegedly had raped a male Iraqi juvenile in the confinement facility. Acting without any claimed or apparent authorization, the persons responsible allegedly screamed at the detainees, ordered them to take off their clothes, and then forced them to crawl and roll down the prison hallway so that their genitals scraped the floor. The soldiers subsequently handcuffed the detainees to each other and posed them in positions to make it appear that they were having homosexual relations. During this time, soldiers took pictures of the detainees. As described below, however, the panel determined that appellant was not guilty of any charges arising out of this incident. We therefore do not consider any of this evidence when assessing the legal and factual sufficiency of the charges.

### The Incident of 4 November 2003

On 4 November 2003, a separate incident took place in Tier 1 involving a detainee whom the MPs called "Gilligan." Photographs taken by Staff Sergeant (SSG) IF show the detainee wearing what appears to be a poncho, with his head and face hooded by an empty sandbag. The detainee is standing on a Meals Ready to Eat (MRE) box (i.e., a carton containing a common kind of rations). Wires are attached to his hands. When asked about the detainee, appellant said in a sworn statement to investigators:

He is nicknamed Gilligan . . . . He was just standing on the MRE box with the sandbag over his head for about an hour. I put the wire on his hands. I do not recall how. I was joking with him and told him if he fell off he would get electrocuted. . . .

. . .

We were not hurting him. It was not anything that bad.

SSG IF presented similar testimony, although he said that he had put wires on the detainee.

*The Incident of 7 November 2003*

On 7 November 2003, some detainees in a tent encampment outside Tier 1 participated in a riot. For greater security, soldiers transferred seven of the suspected leaders of the riot onto Tier 1. These detainees were suspected of various serious street crimes, including rape. When the prisoners arrived at Tier 1, they were hooded and handcuffed. Acting without any claim of authority, MPs from the 372nd took it upon themselves to "discipline" these seven detainees. Appellant admitted in her sworn statement that she saw what was taking place, retrieved a digital camera, and then went to join the soldiers.

Shortly after their arrival at the prison, the MPs forced the detainees to sit or lie down on the floor in a pile. While they were on the ground, Sergeant (SGT) JD stomped on their fingers and toes and Corporal (CPL) CG kneeled on the top of the pile. Shortly afterward, SSG IF and CPL CG punched two of the hooded and handcuffed detainees. Appellant witnessed these actions but took no steps to prevent them. On the contrary, Appellant took a picture of CPL CG posing with his armed cocked, ready to punch a hooded detainee. Other soldiers also took photographs and videos throughout the evening.

The MPs subsequently stripped the detainees of their clothes. In her sworn statement, appellant admitted that she used a marker to write "I'm a rapeist (sic)" on the leg of a naked detainee accused of rape. Photographs admitted into evidence show these words starting on or near the detainee's buttocks and running down the back of his thigh.

When the detainees were naked and handcuffed, CPL CG arranged them to form a human pyramid. Appellant witnessed this misconduct and did not report it. Instead, she took a picture of CPL CG and Private First Class (PFC) LE posing with the pyramid of detainees. Appellant then posed for a picture with CPL CG. In the picture, they are smiling and a giving a "thumbs up" symbol with their hands, with

appellant leaning over the detainee pyramid. Other forms of misconduct allegedly occurred later in the evening, but the evidence did not implicate appellant.

Appellant did not report the incidents of 4 November or 7 November to her chain of command or to anyone else in authority. In her letter of 20 October 2007 to her former roommate, appellant expressed concern about mistreatment of detainees prior to these three incidents. She wrote: "Again, I thought, okay[,] that's funny, then it hit me, that's a form of molestation. You can't do that. . . . The only reason I want to be there is to get the pictures that prove that the U.S. is not what they think." At no time, however, did appellant turn over any photographs until she came under investigation in January 2004.

## II.  Issues Arising from the Bill of Particulars

Charge II alleges that appellant committed the offense of dereliction of duty in violation of Article 92. The single specification of this charge asserts that appellant "[w]ho knew, of her duties at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, from on or about 20 October 2003 to about 1 December 2003, was derelict in the performance of those duties in that she willfully failed to protect Iraqi detainees from abuse, cruelty and maltreatment, as it was her duty to do." Before trial, appellant moved for a bill of particulars, which the government provided. This bill of particulars, as slightly amended, was subsequently submitted to the panel on both the flyer before trial and the findings worksheet used during deliberations. On the findings worksheet, the bill of particulars reads as follows:

1. On or about November 4, 2003, the accused assisted in placing a detainee on a Meals Ready to Eat (MRE) box, sandbag on his head, wires attached to his hands, who was told that if he fell off of the box, he would be electrocuted.

2. On or about November 4, 2003, the accused placed a wire on the detainee's hand.

3. On or about November 4, 2003, the accused photographed and witnessed photographs being taken of the detainee standing on the box with wires attached to his hands and did not stop or report this abuse.

4. On or about the night of November 7, 2003, the accused witnessed detainees forced into a pile on the floor with [CPL CG] kneeling on top of said pile and did nothing to stop or report the abuse.

5. On or about the night of November 7, 2003, the accused posed for a photograph with the detainees stripped and placed in a "human pyramid."

6. On or about the night of November 7, 2003, the accused witnessed fellow

soldiers taking photographs of detainees while abuse occurred and did nothing to stop or report the abuse.

7. On or about the night of November 7, 2003, the accused witnessed SSG [IF] punch a detainee in the chest and did not stop or report this abuse.

8. Throughout the entire time frame, the accused witnessed other military police soldiers photographing detainees and did nothing to stop or report this abuse.

9. On or about 24-25 October, the accused witnessed other soldiers physically abusing detainees and handcuffing them together while naked and did nothing to stop or report this abuse.

When the panel returned its verdict, the panel announced that it had found appellant guilty of the Specification of Charge II and Charge II, with the exception of the language in paragraphs 1 and 9 of the bill of particulars as quoted above.

The court-martial's procedure in connection with this finding was irregular. Under Rule for Courts-Martial [hereinafter R.C.M.] 918(a), a court-martial makes findings only on specifications and charges. A bill of particulars is not a charge, and it is not a specification or even part of a specification. *See United States v. Rivera*, 62 M.J. 564, 566 (C.G. Ct. Crim. App. 2005). The Discussion to R.C.M. 906(b)(6) explains that a bill of particulars serves "to inform the accused of the nature of the charge with sufficient precision to enable the accused to prepare for trial" and that a bill of particulars "need not be sworn because it is not part of the specification." Accordingly, the military judge should not have required the panel to make findings on the bill of particulars.

In addition, the form of the finding is also irregular. A panel may find an accused guilty of a specification with exceptions. *See* R.C.M. 918(a)(1). But the exceptions must eliminate language that appears in the specification. *See* R.C.M. 918(a)(1) discussion ("One or more words or figures may be excepted from a specification . . . ."). In this case, when the panel found appellant guilty of the Specification of Charge II with exceptions, the exceptions purported to remove language which appeared in the bill of particulars, but not in the specification itself.

In these unusual circumstances, the *Manual for Courts-Martial* offers no clear guidance on the legal effect of the exceptions. To avoid prejudice to the appellant, and with consent given by government counsel at oral argument, we take these three steps:

First, we conclude that the panel intended to find appellant not guilty of any offense arising out of the incident that occurred on 24-25 October 2003 because the panel made an exception for item 9 of the bill of particulars. Apart from item 9 of

5

the bill of particulars, nothing else in the charge sheet addresses the events of this period.  Accordingly, in reviewing appellant's finding of guilt, we will not take into account any evidence concerning these dates.

Second, in our decretal paragraph, we will revise the specification to substitute the word and figures "4 November 2003" for "20 October 2003."  We take this action because item 9 is the only act listed in the bill of particulars that occurred before 4 November 2003.   This action will avoid any possible prejudice to appellant.

Third, in view of the panel's exception for item 1 of the bill of particulars, we conclude that the panel intended to find appellant not guilty of "assisting" in the placement of wires on the hands of the detainee nicknamed "Gilligan" during the incident of 4 November 2003.  We do not conclude, however, that the panel intended to acquit appellant of all misconduct that occurred on 4 November 2003.  The panel found, in Specification 3 of Charge III, that appellant "at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 6 November 2003, did maltreat a detainee, a person subject to her orders, by placing wires on the detainee's hands while he stood on a Meals Ready to Eat box with this (sic) head covered and then telling him if he fell off the box he would be electrocuted."  Thus, we conclude that the panel found that appellant did not provide assistance, but that she did commit the act herself.

## III.  Factual and Legal Sufficiency of the Evidence

Appellant contends that the evidence is legally and factually insufficient to sustain her conviction.  The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all of the essential elements beyond a reasonable doubt."  *See United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987).  Further, in resolving legal-sufficiency questions, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution.  *See United States v. Rogers*, 54 M.J. 244, 246 (C.A.A.F. 2000).  The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of [the appellate court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

### A.  Charge I—Conspiracy

Charge I alleges that appellant committed the offense of conspiracy in violation of Article 81, UCMJ.  The single specification asserts that appellant "[d]id, at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 8 November 2003, conspire with Staff Sergeant [IF], Sergeant [JD], Corporal [CG],

Specialist [JS], Specialist [MA] and Private First Class [LE], to commit an offense under the Uniform Code of Military Justice, to wit: maltreatment of subordinates, and in order to effect the object of the conspiracy the said Specialist Harman posed for a 'thumbs up' photograph with said Corporal [CG] behind a pyramid of naked detainees."

To obtain a conviction for conspiracy, the government must prove the following two elements beyond a reasonable doubt: "(1) That the accused entered into an agreement with one or more persons to commit an offense under the code; and (2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy." *Manual for Courts-Martial, United States* (2005 ed.) [hereinafter *MCM*], Part IV, para. 5b. For the first element, the government's theory, apparently accepted by the panel, was that appellant's conduct both in taking pictures of the maltreatment and posing in pictures depicting maltreatment demonstrates that she entered into a non-verbal agreement with the other guards to maltreat detainees. For the second element, the government's theory was that posing in the "thumbs up" photograph was an overt act.

Appellant contends that the evidence did not prove beyond a reasonable doubt that she formed an agreement to commit the maltreatment of subordinates or that she had the specific intent to commit the crime. To support this position, she makes three arguments. First, she asserts that as the most junior enlisted member assigned to perform duties in her part of the prison, she had no choice but to be present when many of the activities characterized as maltreatment occurred. Her passive presence, she contends, does not show the existence of a conspiracy. We disagree. As the government argues, while appellant's presence at the prison was mandatory, her misconduct was not. She did not have a duty to appear in a "thumbs up" picture with CPL CG behind the pyramid of naked detainees, to take pictures herself, or to engage in any other concerted misconduct. Her entering into a conspiracy and her participation in the specified overt act were voluntary.

Second, appellant argues that, while she did pose for a "thumbs up" photograph with CPL CG, this photograph does not prove that she shared any common purpose with him to abuse detainees. On the contrary, she asserts, this photo indicates simply that she was posing for a picture as she often did in many of her experiences in Iraq. She contends that the court-martial had no justification for drawing inferences from her act of smiling in the photograph. We disagree. Her smiling face, when seen with the "thumbs up" hand signals, shows approval and encouragement to her co-conspirators as they maltreated the prisoners. An inference that she was joining their purpose is justified.

7

Third, she contends that the letter that she wrote on 20 October 2003 shows that she did not have the requisite intent. In the letter, as quoted above, she describes abuse in the prison to her roommate in the United States. She says: "The only reason I want to be there is to get the pictures that prove that the U.S. is not what they think." Appellant asserts that this comment demonstrates that she wanted to report criminal wrongdoing and that she would not agree to join a conspiracy. We disagree. Appellant's conscience may have been in one place on 20 October 2003 when she realized that maltreating detainees was wrong, but her intentions and actions were in another when she joined in and encouraged the abuse on 8 November 2003. The circumstances show that she had the intent to commit the offense of conspiracy. We conclude that the evidence was legally and factually sufficient to support her conviction of Charge I and its Specification.

**B. Charge II—Dereliction of Duty**

We have quoted Charge II, its Specification, and the bill of particular in section II of our opinion above. The charge alleges that appellant committed the offense of dereliction of duty in violation of Article 92. The specification asserts that appellant "[w]ho knew, of her duties at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, from on or about 20 October 2003 to about 1 December 2003, was derelict in the performance of those duties in that she willfully failed to protect Iraqi detainees from abuse, cruelty and maltreatment, as it was her duty to do."

To obtain a conviction for willful dereliction of duty, the Government must prove beyond a reasonable doubt: "(l) That the accused had certain duties; (2) That the accused knew or reasonably should have known of the duties; and (3) That the accused was willfully derelict in the performance of those duties." *See MCM*, Part IV, para 16b(3). The government's theory, accepted by the court-martial, was that appellant violated these elements through the conduct detailed in items 2 through 8 of the bill of particulars quoted above.

Appellant argues that the evidence is legally and factually insufficient to sustain her conviction for two principal reasons. First, she contends that the evidence does not show that she knew or reasonably should have known of her duties to protect the detainees. She asserts that she was not adequately trained to serve as a prison guard and was not adequately trained in the law of armed conflict. She emphasizes that her company commander testified that her unit was unprepared to perform the mission they were assigned at Abu Ghraib. In addition, given that nudity and handcuffing detainees was common in the prison, she asserts that it was not clear which acts were permissible and which ones were not.

We disagree. Appellant may not have had the ideal training, or even good training, for serving in the prison. Her unit certainly did not behave as a well-

trained military police company should.  But the facts and reasonable inferences from the facts establish beyond a reasonable doubt that appellant knew that her duties included protecting Iraqi detainees from the kinds of abuse, cruelty, and maltreatment alleged in the specification and in the portions of the bill of particulars of which she was found guilty.  On a previous occasion, appellant and another member of her company, SPC MA, removed the handcuffs from a detainee who had been handcuffed for six hours and reported the incident to a non-commissioned officer, an action which resulted in the removal of the responsible MP from duties at the location.  In addition, SSG IF testified that prison guards knew that they had a duty to protect and care for the detainees.  Finally, in her own letter of 20 October 2003, appellant recognized the wrongfulness of the misconduct.  This evidence supports the conclusion that she knew her duties.

Second, appellant argues that she was not derelict in her duties because she was in fact taking steps to expose the abuse, as her letter of 20 October 2003 indicates.  She asserts that she was taking photographs to document her company's misconduct, which she was planning to report.  We disagree with this argument.  Even if we credit what she said in her letter, she was still derelict when she committed the acts detailed in items 2 through 8 of the bill of particulars.  She was derelict in her duties when she attached the wires to the hands of the detainee nicknamed "Gilligan" and threatened him with electrocution, as alleged in items 2 and 3 of the bill of particulars.  She was also derelict in her duties when she posed in a "thumbs up" photograph as alleged in item 5 of the bill of particulars.  She did not take these actions to reveal the wrongdoing of others.  In addition, when she witnessed the misconduct of others alleged in items 4, 5, 7, and 8 of the bill of particulars she did nothing to stop it.   Although she did take pictures, she did not contact any person in authority to report the misconduct or to turn over the pictures.

### C.  Charge III—Maltreatment

Charge III accuses appellant of cruelty and maltreatment in violation of Article 93.  To obtain a conviction of this offense, the government must prove beyond a reasonable doubt:  "(1) That a certain person was subject to the orders of the accused; and (2) That the accused was cruel toward, or oppressed, or maltreated that person." *MCM*, Part IV, para. 17b.  The *MCM* does not define cruelty, oppression, or maltreatment, other than to say that the offending conduct is "not necessarily physical" and that it "must be measured by an objective standard." *Id.* at para. 17c(2).  Our superior court, however, clarified the offense in *United States v. Carson*, 57 M.J. 410, 415 (C.A.A.F. 2002).  The parties agree that this case controls.

In *Carson*, the court explained:  "The essence of the offense is abuse of authority. Whether conduct constitutes *maltreatment* within the meaning of Article 93, UCMJ, in a particular case requires consideration of the specific facts and circumstances of that case." *Id.* at 415 (emphasis in original).  The court in *Carson*

recognized that the Military Judges' Benchbook includes "a nonbinding model instruction describing maltreatment as 'unwarranted, harmful, abusive, rough, or other unjustifiable treatment which, under all the circumstances . . . results in mental or physical pain or suffering.' " *See id.* at 413 (quoting Dep't of Army Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 3-17-1 (1 April 2001)). But the court did not agree that the government must prove that the victim actually suffered harm, as the model instruction indicated. The court said:

> We conclude that in a prosecution for maltreatment under Article 93, UCMJ, it is not necessary to prove physical or mental harm or suffering on the part of the victim, although proof of such harm or suffering may be an important aspect of proving that the conduct meets the objective standard. It is only necessary to show, as measured from an objective viewpoint in light of the totality of the circumstances, that the accused's actions reasonably could have caused physical or mental harm or suffering.

*Id.* at 415.

*Specifications 1 and 2*

Specification 1 of Charge III alleges that appellant "at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 8 November 2003 did maltreat several detainees, persons subject to her orders, by taking two or more photographs of the naked detainees in a pyramid of human bodies." Specification 2 alleges that appellant "at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 8 November 2003, did maltreat a detainee, a person subject to her orders, by photographing another guard, Corporal [CG], with one arm cocked back as if he was going to hit the detainee in the neck or back."

Appellant argues that the evidence is legally and factually insufficient to support her conviction of these two specifications because no detainee testified during the findings portion of the trial that he felt maltreated by appellant or that he was even aware that she took photographs of him. We disagree. As explained above, in *Carson*, our superior court specifically held that the government need not prove that the victims of maltreatment actually suffered harm.

In the totality of the circumstances, we conclude that appellant's actions described in Specifications 1 and 2 constitute maltreatment. Taking the photographs reasonably could have caused the detainees mental suffering. No reasonable detainee would want to be abused and, more importantly here, would wish his abusers to record this pointless, humiliating conduct. The detainees, in addition, had no ability to leave or to object or to do anything but what they were told. Appellant abused her authority as a guard in photographing the detainees.

At oral argument, counsel for appellant contended that taking the photographs was trivial in comparison to other misconduct at the prison that has gone uncharged and that may even have been sanctioned by persons in authority. We recognize that context matters. As our superior court said in *Carson*:

> Appropriate conduct can only be discerned by examination of the relevant surrounding circumstances. For example, what is condoned in a professional athletes' locker room may well be highly offensive in a house of worship. A certain amount of banter and even profanity in a military office is normally acceptable and, even when done in "poor taste," will only rarely rise to the level of criminal misconduct.

*Id.* at 413 (quoting *United States v. Hanson*, 30 M.J. 1198, 1201 (A.F.C.M.R. 1990). Appellant's conduct, however, clearly crossed the line even in its own context, a rough prison in a war zone holding dangerous detainees suspected of serious criminal offenses. Any reasonable observer would agree that taking the photographs of the detainees was abusive. The photographs served no purpose other than to humiliate and degrade.

*Specification 3*

Specification 3 of Charge III alleges that appellant "at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 6 November 2003,[1] did maltreat a detainee, a person subject to her orders, by placing wires on the detainee's hands while he stood on a Meals Ready to Eat box with this (sic) head covered and then telling him if he fell off the box he would be electrocuted." Appellant contests the legal and factual sufficiency of the evidence on this specification on several grounds.

First, appellant argues that placing wires on a detainee's hands and telling him that he would be electrocuted, when the wires were not, in fact, connected to any electrical outlet, does not constitute maltreatment. We disagree. The evidence shows that the detainee had an empty sandbag over his head as a hood. A reasonable inference is that he was limited in his ability to see whether the wires actually were connected to an electrical outlet. Indeed, the photographs themselves do not show where the wires lead. In addition, the panel could infer, as do we, that appellant would not have told the detainee that he would be electrocuted, and the detainee would not have stood on the box for over an hour, if the threat of electrocution was not credible in the mind of the detainee. This conduct was abusive and constitutes maltreatment under the standards in *Carson*.

---

[1] At trial, the parties agreed that the relevant conduct had occurred on 4 November 2003, but chose not to alter the specification as it included the language "on or about" 6 November 2003.

Second, appellant asserts that the detainee did not testify and there was no evidence that he was traumatized by these acts in any way. Again, under the standard in *Carson*, we conclude that a reasonable person would feel frightened and threatened. The detainee's actual testimony was not necessary.

Third, appellant argues that the evidence is insufficient because SSG IF testified that he was the one who put the wires on the detainee. This argument, however, ignores appellant's sworn statement in which she admitted that she put the wires on him. We see no conflict. Both soldiers were present, and their own statements show that they each placed the wires on the detainee.

Finally, appellant argues, consistent with her sworn statement, that she believed they were joking when they put the wires on the detainee and that she did not believe he suffered any harm. This argument also has no merit. Under *Carson*, the focus is not on the subjective views of the oppressor or of the victim, but on whether the conduct is objectively abusive. Any reasonable observer would conclude that the conduct was so abusive that it constitutes maltreatment in violation of Article 93.

*Specification 4*

Specification 4 of Charge III alleges that appellant "at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 8 November 2003 did maltreat a detainee, a person subject to her orders, by writing the word 'rapeist [sic]' on the detainee's leg who was then made to pose naked with other detainees." Appellant admitted in her sworn statement that she wrote the word on the detainee. But she contends that this act does not constitute maltreatment.

Appellant argues that it was not unusual to write words and figures on the bodies of detainees. Testimony established that the MPs at the prison sometimes used markers to write prisoners' cell numbers on their arms. In at least one instance, the MPs also wrote the word "knife" on the hand of a detainee who had been caught with a knife. Appellant further argues that the detainee upon whom she wrote the word was in fact a suspected rapist. She points out that there is no evidence that this detainee knew what was written on him, objected to it, or suffered any harm from it.

We disagree. Again, under *Carson*, it is the objective perspective of a reasonable person, rather than the subjective reaction of the victim, that determines whether maltreatment has occurred. From an objective perspective, appellant's action constituted maltreatment. Staff Sergeant IF testified that guards did not write the names of crimes on detainees. No evidence showed that guards wrote on parts of the body observable only when the detainee was naked. Writing the word on the detainee could serve no purpose other than to humiliate him for the sake of amusement. Specialist JS confirmed this conclusion. He testified that during the

12

incident, appellant was "kind of happy, like it was a joke." For these reasons, we conclude that the evidence was legally and factually sufficient.

## IV. Abuse of Discretion in Denying a Challenge for Cause

During individual voir dire, a member of the panel, Command Sergeant Major (CSM) LP, informed the parties that she had been an alternate member for a panel that heard the court-martial of a companion case. Command Sergeant Major LP, however, did not act in that case and could not recall the accused's name. She also revealed that she had seen some news stories pertaining to the incidents at Abu Ghraib. She remembered seeing pictures of detainees stacked in a pyramid and of a detainee standing on a box with wires attached to him. She recalled, not entirely accurately, that there had been a "mistrial" in the case of a co-accused for which she was an alternate panel-member, that the reason for this "mistrial" was that "the judge decided that the there was evidence presented that [the co-accused] may have been innocent," and that another co-accused received a sentence of "11 years." In response to questions, CSM LP said that she would decide this case based solely on what she heard at trial and that she would disregard anything that may have happened in another case.

Appellant challenged CSM LP for cause. The record contains some ambiguity as to whether appellant based the challenge on grounds of actual bias or instead on grounds of implied bias. The military judge considered CSM LP's knowledge of the sentence of an accused in a companion case but recognized that this information was likely to come into evidence during trial (as it ultimately did). The military judge also considered CSM LP's belief that a mistrial had been ordered for another accused, but questioned how this information would be prejudicial to appellant. The military judge then rejected the challenge. In taking this action, the military judge did not address implied bias. Appellant later used her peremptory challenge to excuse CSM LP.[2]

---

[2] To preserve the challenge for appeal, appellant's counsel declared that, if the military judge had excused CSM LP for cause, appellant would have used her peremptory challenge on another panel member, Sergeant Major (SGM) BH. At the time of trial, an accused could preserve an objection to the denial of a challenge for cause in this manner. *See United States v. Eby*, 44 M.J. 425, 427 (C.A.A.F. 1996). The Rules for Courts-Martial, as amended on 18 October 2005, no longer authorize this method of preserving challenges. *See* R.C.M. 912(f)(4) ("When a challenge for cause has been denied the successful use of a peremptory challenge by either party, excusing the challenged member from further participation in the court-martial, shall preclude further consideration of the challenge of that excused member upon later review."). Because we conclude that the challenge for cause has no merit, we do not address the question of how the amendment affects pending cases.

Appellant now contends that the military judged erred in denying the challenge for cause of CSM LP. On appeal, both parties have treated the challenge as one for implied bias. They agree on the applicable rules and standard of review. "[T]he test for implied bias is objective, and asks whether, in the eyes of the public, the challenged member's circumstances do injury to the 'perception of appearance of fairness in the military justice system.' " *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (quoting *United States v. Moreno*, 63 M.J. 129, 134 (C.A.A.F. 2006)). "Issues of implied bias are reviewed under a standard less deferential than abuse of discretion but more deferential than de novo." *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). "A military judge who addresses the concept of [implied bias] on the record is entitled to greater deference than one who does not. However, this does not suggest that the military judge [who does not address implied bias] is entitled to no deference." *United States v. Hollings*, 65 M.J. 116, 119 (C.A.A.F. 2007).

Appellant argues that the military judge treated CSM LP's knowledge of outcomes in the related cases as essentially inconsequential. She asserts that a member of the public, however, would consider CSM LP's participation in the court martial unfair because she would "carry her knowledge of the outcome of prior cases into the deliberation room" and that there was too great a risk that, despite saying that she could set this knowledge aside, she would not be able to do so. In addition, according to appellant, a member of the public might conclude that CSM LP's senior rank and knowledge would influence other members, resulting in an unfair trial.

We recognize that, "[i]n close cases military judges are enjoined to liberally grant challenges for cause." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007). But we do not consider this a close case. CSM LP's minimal knowledge of companion cases, vaguely remembered from news reports, was not cause for excusing her. In *United States v. New*, 50 M.J. 729, 734 (Army Ct. Crim. App. 1999), *aff'd* 55 MJ. 95, 98 n.1 (C.A.A.F. 2001), a soldier disobeyed orders to wear United Nations insignia on his uniform. His act of protest engendered widespread media stories. *Id.* Appellant challenged the presence of a member of his panel on grounds of actual and implied bias in part because the member "had read numerous news articles concerning appellant's case." *Id.* at 746. On appeal, we found no implied or actual bias, concluding that the member's "connections to the matters challenged by appellant were professional rather than personal and were not atypical of an officer in his position." *Id.* at 747.[3] We reach the same conclusion here. A member of the public would not believe that a senior non-commissioned officer, like CSM LP, who said she could be objective, would in fact be biased or would serve

---

[3] Our superior court affirmed our decision, but did not reach the issue whether the member's reading the newspaper was cause for excusing him. *See New*, 55 MJ. at 98 n.1.

unfairly merely because she had seen or heard news stories about matters relating to appellant's case.

In addition, no per se rule bars members who have connections to companion cases. *See United States v. Ferguson*, 27 M.J. 660, 661 n.3 (N.M.C.M.R. 1988) (summarily rejecting an argument that a military judge erred by failing to grant a challenge for cause of an officer who previously was a member in a companion case). In this case, although CSM LP had been assigned to serve as an alternate on a companion case, she did not in fact serve on the case. Indeed, she could not even remember the name of the accused in that case. Further, at oral argument, counsel for appellant acknowledged that the military judge properly inquired into the specific knowledge possessed by CSM LP and how possession of that knowledge might or might not be prejudicial to appellant. As set forth above, the military judge recognized that information about the sentence in another case was likely to come into evidence in any event and that information regarding the mistrial of another accused was, if anything, helpful to appellant. This thorough inquiry showed efforts to ensure the fairness of the trial. A member of the public would conclude that CSM LP could be a fair and impartial court member.

## VI. Conclusion

For reasons addressed in section II above, we amend the Specification of Charge II as follows:

> In that Specialist Sabrina D. Harman, U.S. Army, who knew of her duties at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, from on or about 4 November 2003 to about 1 December 2003, was derelict in the performance of those duties in that she willfully failed to protect Iraqi detainees from abuse, cruelty and maltreatment, as it was her duty to do so.

The findings of guilty of the Specification of Charge II and Charge II, as amended, are affirmed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted, the entire record, and applying the principles of *United States v. Sales,* 22 M.J. 305 (C.M.A. 1986), and *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006), to include the factors identified by Judge Baker in his concurring opinion, we affirm the sentence.

Senior Judge GALLUP and Judge CHIARELLA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court