978 A.2d 921 (2009)
409 N.J. Super. 552
STATE of New Jersey, Plaintiff-Respondent,
v.
Aurelio Ray CAGNO, Defendant-Appellant.
Docket No. A-7021-03T4.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 2009.
Decided September 10, 2009.
*925 James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Mr. Yomtov, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges STERN, RODRÍGUEZ and ASHRAFI.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was indicted for, and convicted at his second trial of, "racketeering conspiracy," N.J.S.A. 2C:41-2(d) and N.J.S.A. 2C:5-2, and murder, N.J.S.A. 2C:11-3(a)(1) and (2) and 2C:2-6. He was sentenced to consecutive terms of life imprisonment with thirty years to be served before parole eligibility for the murder and twenty years with ten years of parole ineligibility for the conspiracy. The aggregate sentence was life plus twenty years with forty years to be served before parole eligibility.
On his appeal defendant, through counsel, raises seven contentions he claims require reversal. They include the failure "to charge conspiracy to commit murder as a lesser-included offense to the murder"; that "[b]ecause the conspiracy clearly terminated prior to the five-year statute of limitations, a judgment of acquittal should have been entered on the conspiracy to commit racketeering count" and that the murder conviction must also be reversed because of the related prejudice; a judgment of acquittal should have been entered on the conspiracy charge because "the only alleged conspiratorial act that took place within the five year statute of limitations" was dismissed at the first trial; "the jury charge on the statute of limitations and termination of a conspiracy were legally incorrect" and shifted the burden of proof; the trial judge committed reversible error by allowing testimony about Salvatore Lombardino's refusal to testify at the defendant's first trial; the charge on conspiracy was incorrect because "it failed to require the jurors to reach a unanimous verdict on the alleged racketeering acts" and the sentence on the conspiracy conviction is "illegal because conspiracy to commit racketeering is a second degree crime." We affirm the convictions and sentence.
The proofs at trial reflect that defendant was a member of the Colombo organized crime family. We need not detail the proofs concerning organized crime, the Colombo family or its involvement in racketeering.
*926 Defendant's brother Rocco was the principal witness for the State. Together with Jimmy Randazzo and others, defendant and Rocco participated in the murder of Jimmy Angellino at Rocco's home in Kenilworth, New Jersey in 1988. Thereafter, the brothers and Lombardino[1] were involved in the May 1993 execution of Randazzo in Tinton Falls, New Jersey.
Defendant, Rocco and others were indicted by a federal grand jury in the Eastern District of New York (EDNY) for various crimes related to the Angellino murder, and Lombardino was indicted in the District of New Jersey with respect to the Randazzo murder. Rocco entered into a cooperation and plea agreement with the United States Attorney. In May 1994, Rocco pled guilty to a one count information including a RICO conspiracy involving the murders of Angellino and Randazzo. Lombardino entered into a negotiated plea including conspiracy to murder Randazzo, but the Government could reinstate the entire indictment if he ultimately testified for defendant in connection with the Randazzo matter. That term of the agreement was subsequently deleted. Defendant also entered a guilty plea to a racketeering conspiracy in 1995 in the EDNY.
At defendant's state trial on the first indictment in 2002, Lombardino refused to testify, and invoked the Fifth Amendment outside the presence of the jury. That prosecution ended in a "hung jury." The State grand jury returned a superseding indictment. At the second trial, resulting in the judgment before us, the State introduced witnesses concerning Lombardino's gesturing and exchange with defendant at the first trial. Defendant's appeal is from the conviction at the second trial.

I.
The first indictment was returned against defendant on February 24, 2000. It charged defendant, as "a made member or soldier of the Colombo Crime Family and New Jersey Colombo Crew," with first degree racketeering conspiracy in violation of N.J.S.A. 2C:41-2(d) and N.J.S.A. 2C:5-2 (count one), and with the May 17, 1993 murder of James V. Randazzo in violation of N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:2-6 (count two). The conspiracy count alleged the following overt acts: (1) "In or about November 1988, in Kenilworth, New Jersey, the defendant . . . with others whom he aided or agreed or attempted to aid in the planning and commission of the offense, shot and killed Vincent `Jimmy' Angellino, a high ranking member of the Colombo Crime Family"; (2) "On May 17, 1993, in Tinton Falls, New Jersey, the defendant . . . with others, including co-conspirator Salvatore Lombardino, shot and killed James V. Randazzo, as he sat in his car, which was parked in a hotel parking lot"; (3) "On or about January 20, 1994, in Union, New Jersey, co-conspirator Lombardino had a conversation concerning the murder of Randazzo, during which Lombardino suggested that he, [Rocco and defendant] should get together and discuss their false alibis . . . to avoid prosecution for the murder of . . . Randazzo"; and
4. On or about May 1, 1998 and on or about October 8, 1998, co-conspirator Salvatore Lombardino, in violation of a federal court order compelling his testimony and in contempt of court, refused to answer questions concerning the involvement of another person in the murder of James V. Randazzo, in an attempt to conceal from law enforcement authorities the identity of defendant, RAY CAGNO, as a member of the Colombo Crime Family and as having been involved *927 in the murder of James V. Randazzo.
As a result of a hung jury, defendant's first trial ended in a mistrial on June 28, 2002.
A two-count superseding indictment was returned on January 2, 2003. It again charged defendant with "racketeering conspiracy-first degree" and the murder of Randazzo. With respect to the racketeering conspiracy count, the superseding indictment charged the same first three overt acts as charged in the original indictment, deleted the original fourth overt act, and charged as overt acts four and five that on or about June 13, 2002 and June 18, 2002, respectively:
co-conspirator Salvatore Lombardino, during a prior proceeding in the matter of the State of New Jersey v. Ray Cagno, in violation of a Superior Court of the State of New Jersey, Law Division-Criminal court order compelling his testimony and in contempt of the court, refused to answer questions concerning the murder of James V. Randazzo and communicated with, and gestured to the said RAY CAGNO in an effort to effectuate and perpetuate certain rules of the Colombo Crime Family and the New Jersey Colombo Crew, to conceal from law enforcement authorities the identity of the said RAY CAGNO as a member of the Colombo Crime Family and as having been involved in the murder of James V. Randazzo, and to provide reassurance to the said RAY CAGNO of the ongoing nature of the racketeering conspiracy.
Defendant filed unsuccessful pretrial motions before both trials. Among them were the motion "to dismiss the RICO conspiracy count (Count One) based upon a failure to satisfy the statute of limitations because the charged overt acts are flawed" and "to amend the RICO conspiracy count (Count One) to a second degree offense rather than a first degree offense."

II.
Through their loan-sharking and gambling activities, and extortion in the business of refuse disposal, the Colombo family had engaged in criminal activities that affected commerce within this State. For an associate to become a "made member" of the family, he is observed for a lengthy time period, has to show extreme loyalty to the family and has to be sponsored by a captain. At the "making" ceremony, the candidate must take the oath of "Omerta" or silence. He swears "allegiance to the family that if [he] betrayed [his] friends in the family, [he] should burn in hell." Betrayal, which occurs when a "rat" cooperates with law enforcement, is punishable by death. The killing of a "rat" must be sanctioned by the boss. An "unsanctioned" killing may itself result in the murder of the perpetrators.
Defendant and his brother, Rocco, had been associated with La Cosa Nostra (LCN) since the late 1960s or early 1970s. Rocco was involved with "[b]ookmaking, cigarette smuggling [and] murder." In 1977, Rocco and Randazzo committed a murder. Randazzo, a loan shark, asked Rocco to assist in killing a man who owed him money. Randazzo brought the man to Rocco's bar which was closed for the day. Rocco "hit [the man] in the head with a club"; both Randazzo and Rocco then choked him. Randazzo put the body in the trunk of his car. Rocco did not know the victim's name or where Randazzo disposed of the body. Rocco was not questioned by the police about this murder and was unaware if Randazzo had been questioned.
In July 1987 Randazzo told Rocco that he and defendant were going to be "made." Randazzo, Rocco, defendant and *928 Tony Scianna, an acting Colombo capo, drove to Queens, New York where the "making" ceremony took place. Randazzo was Rocco's sponsor. Their fingers were pricked with a needle and their blood was smeared on a cardboard image of a saint, which was ignited. Holding the burning saint, Rocco swore that if he broke the oath of silence (Omerta) he would "burn in hell as [the] saint . . . burn[ed] in [his] hand." He also promised that he would "do a piece of work" (kill someone) if requested.
Rocco further testified that he and defendant participated in the murder of Angellino in November 1988. Rocco's home was selected as the site because it could be accessed through the garage without anybody being seen from the driveway. It was decided that Carmine Sessa and Billy Cutolo would do the shooting from the top of the steps because they were capos and Angellino, the intended victim, was an acting consigliere. Defendant, who was armed, was instructed to hide and be ready as a back-up to the shooters.
Randazzo brought Angellino to Rocco's house. Rocco, who had stashed his gun in the basement, opened the garage door for them. The lights went out and Rocco heard shots. When the lights went on, "Angellino was in a corner on the bottom of the steps." Angellino's body was put into a body bag that Randazzo had brought, and was placed in the trunk of Randazzo's car.
In 1991 or 1992, Rocco had new steps installed in the area where Angellino was killed. Defendant relayed a message to Rocco from Carmine Sessa that Rocco should have this work done to thwart any search for blood. In view of a developing internal struggle within the family, there was a fear that someone would "turn" with regard to the Angellino murder.
Randazzo was an acting captain of Sal Profaci's crew, to which defendant and Rocco were assigned in 1992. Beginning in 1980 Rocco began borrowing money from Randazzo. Rocco told Randazzo that he lent out the borrowed money. Over a fourteen-to fifteenyear period, Rocco repaid close to $400,000 against loans totaling $40,000.
After Randazzo was incarcerated in 1992, Dominic Prosperi collected payments from Randazzo's debtors. Pursuant to a search warrant, in December 1992 the FBI recovered Randazzo's loanshark notebook from the residence of Joseph Prosperi, Dominic's father. Rocco was visiting Randazzo in jail when they learned that Randazzo's notebook had been seized by the FBI. Randazzo became upset and said he (Randazzo) was "dead."
As a result of Randazzo's reaction, Rocco became concerned that Randazzo would "turn" and implicate him in the two murders described above. Rocco spoke about his concerns with Lombardino and with defendant, who also could have been implicated in the Angellino murder. All three were in favor of killing Randazzo, and spoke with that purpose in mind "over the next couple of months." Rocco became more concerned when he learned that Randazzo was calling in his loans and selling his car, indicating that Randazzo "was getting ready to leave." Defendant and Lombardino shared Rocco's concerns.
Rocco became increasingly worried when Randazzo showed him an April 13, 1993 newspaper article that reported that Carmine Sessa was cooperating with the authorities. According to Rocco, Randazzo said he could understand why Sessa turned. Sal Profaci also expressed concerns about Randazzo.
As noted above, under LCN's rules, the killing of a "made" member must be sanctioned. However, Rocco, defendant, and *929 Lombardino decided not to get approval for the Randazzo murder. At a meeting attended by Profaci, Rocco, defendant and Lombardino, Lombardino said "we ought to whack Jimmy Randazzo."
The plan to kill Randazzo took shape as Randazzo sought to meet with Profaci. Refusing, Profaci, said that Randazzo "had too much heat [law enforcement] on him and he [Profaci] didn't trust him anymore." Rocco told Randazzo that he would "have to wait awhile for the meeting."
After rejecting Bloomfield as a place for the murder, Rocco, defendant and Lombardino chose the shore area. At one time, defendant had operated a pizza restaurant and an equipment supply company in Long Branch, and he lived in Toms River.
A hotel parking lot in Tinton Falls was the planned site of Randazzo's murder. On Monday May 17, 1993, Rocco met defendant and Lombardino at the parking lot. Rocco had refused Randazzo's earlier request to ride with him to the lot on the pretense that Rocco had an earlier meeting with Profaci. Upon meeting Lombardino and defendant, Rocco got in the rear seat of Lombardino's car and Lombardino drove to a nearby Holiday Inn with defendant in the front passenger seat. Rocco gave Lombardino the gun to use in the killing.
The trio met Randazzo at the Holiday Inn; that location was rejected as the murder site because it was too crowded. Defendant, who was designated as the shooter, was to ride with Randazzo in his car from the Holiday Inn to the other hotel where the killing was to take place. Rocco and Lombardino were to follow as "back-up."
At the Holiday Inn, Lombardino parked his car behind Randazzo's. Rocco hid the gun as Randazzo approached. In response to Randazzo's question about what he was doing there, Rocco replied that Profaci was at the other hotel. Defendant told Randazzo that he would ride with him.
After Randazzo and defendant got in the driver and passenger seats of Randazzo's car, they engaged in a "struggle." Lombardino and Rocco got out of Lombardino's car. Before Lombardino got to the driver's side door of Randazzo's car, Rocco heard a shot. After trying to get a clean shot to avoid hitting defendant, Lombardino fired once into Randazzo's car through the driver's open door and fired a second shot in Rocco's direction. Rocco did not have his gun with him as it remained on the back floor of Lombardino's car. Aside from Lombardino's two shots, Rocco heard two or three others.
Rocco saw a man in the parking lot taking down a plate number, other men in an upstairs window of the hotel, and a woman crossing the lot who began to run when she heard the shots.
Lombardino reentered the driver's seat of his car and Rocco got in front. Staggering, defendant left Randazzo's car and leaned against a wall. Upon Lombardino's urging, defendant got in the back seat of Lombardino's car.
The license plate number of Lombardino's vehicle was observed by bystanders, and Lombardino was identified from a photo array. Other observers described the assailants.
After driving away from the parking lot, Rocco cleaned the guns of fingerprints and threw them out the car window onto a grassy area. Rocco did not remove his gun from the plastic bag before disposing of it.
As Rocco recalled it, in response to Rocco's comment that he hoped Randazzo was dead, defendant replied, "he is I put another one in his head." Defendant also told *930 Rocco that he had hurt his shoulder. Because defendant had blood on his clothes, the trio attempted to find a K-Mart to buy new clothes but the store was closed. Rocco was dropped off at the parking lot where he parked his car and departed. After Rocco got home, he went to bed.
In 1993 both Rocco and defendant habitually smoked non-filtered Pall Mall cigarettes. On the night of the murder, Rocco brought a different brand of cigarettes, explaining, "Pall Mall they would know . . . I just brought a different brand to try to throw anything off the track." Defendant may have asked Rocco for a cigarette, but Rocco was not sure.
A search warrant and search inventory from the Prosperi search were found on the front passenger floor of Randazzo's car. A .38-caliber discharged bullet was discovered in the parking lot next to Randazzo's car and two bullet fragments were taken from the passenger's side front floor of the car.
FBI Special Agent Butler had been involved in the investigation of Randazzo's loansharking operation and became involved in the investigation of his murder. Becoming aware that a car registered to Lombardino was suspected to have been connected to the murder, Butler suggested that local authorities attempt to locate Lombardino, defendant and Peter Campisi. A search of Lombardino's home produced a box of .38-caliber ammunition and an empty holster.
Telephone records indicated that Rocco received telephone calls from defendant's residence at 3:04 a.m. and 5:41 a.m. on May 18, 1993. On both occasions the caller was Rita Cagno, defendant's wife. Normally, Rocco had not received phone calls from Rita at 3:00 a.m. on other occasions. Records also showed a 5:15 a.m. three-minute call from Lombardino's residence to defendant's, and a 5:56 a.m. one-minute call from Rocco's residence to defendant's, during which time Rocco again spoke to Rita.
Records reflected five telephone calls between 5:13 p.m. and 6:59 p.m. on May 18, 1993, from Rocco's residence to defendant's, which Rocco agreed was not commonplace.
A consent search of Randazzo's house recovered an April 13, 1993, Daily News article that reported the cooperation of Colombo LCN figure Carmine Sessa. Papers containing names of defendant, Rocco, and Lombardino along with their phone numbers were among the papers found at the Randazzo home.
Joseph Monahan of the State Police Intelligence Bureau, who had been advised of Randazzo's murder, responded to the Tinton Falls Police Department on the morning of May 18, 1993, to render assistance. Accompanied by Monmouth County investigator Peter Short, Monahan drove into Long Branch in an undercover car. Monahan chose Long Branch because defendant had been previously involved in the pizza parlor and restaurant supply business there.
May 18, 1993 was a "raw" and "overcast" day, and it was drizzling. As he was driving, Monahan saw defendant walking in the opposite direction. He stopped the car and asked defendant if he wanted to go for a ride. Monahan said that he was investigating a homicide. In response to Monahan's question why defendant "was walking on such a rotten day," defendant replied that he had "nothing to say." Defendant was dressed in a sweatshirt and jeans but was not wearing a raincoat or carrying an umbrella.
John Tesauro, who in 1993 was a captain with the detective division of the Monmouth County Prosecutor's Office, briefly chatted with defendant on the afternoon of *931 May 18, 1993, while defendant was at the Tinton Falls Police Department. Tesauro noted that defendant's "hair was mussed" and "disheveled," that he was "unshaven," "[h]e had a shadow of a beard and his eyes were puffy and swollen as though he hadn't slept."
A federal search warrant had been obtained to search defendant's person for physical trauma. The warrant was executed at the Tinton Falls police station in the presence of FBI Special Agent David Kelly. Defendant removed his clothing. Although there was no indication of any injury, Kelly noticed that defendant "had some difficulty trying to get the sweatshirt over his head." Later that afternoon, Monahan drove defendant back to Toms River and dropped him off a block away from his house.
A search of defendant's house on the afternoon of May 18, 1993, resulted in the seizure of telephone records, a notebook, phone numbers, check ledgers, cassettes from the answering machine, a slip of paper bearing Randazzo's name and phone number and another piece of paper with a phone number, and the notation "Tutti . . . beeper."
Although defendant was not under arrest on May 20, 1993, the FBI obtained his fingerprints and photographs at that time. On that occasion, FBI Agent Butler spoke to defendant about the FBI's pre-May 17, 1993, investigation into Randazzo's loan-sharking operation. After telling defendant that many people were interviewed, defendant asked if the FBI had spoken to Randazzo. When Butler said that he had not, defendant's "eyes grew wide." According to Butler, "[i]t appeared to be disbelief . . . [defendant] was surprised."
Rocco's home was also searched by the FBI on May 20, 1993. Tiles were taken from the area where Angellino was murdered and bullets were seized from a robe hanging in a clothes closet. During the search, defendant called Rocco from Newark Airport and said that he was going to Las Vegas where he had in-laws. Rocco told defendant about the in-progress search and nothing else was discussed. Defendant called Rocco on seven occasions from Las Vegas between May 21 and May 29, 1993. Rocco did not recall having received that many phone calls from defendant when he had been in Las Vegas on prior occasions.
Three handguns and ammunition were recovered during the investigation. The first gun was recovered from a grassy area off Asbury Avenue in Ocean Township during the morning of May 20, 1993. This gun was an unloaded Smith & Wesson .38-caliber revolver with a two-inch barrel.
On the afternoon of May 20, 1993, a torn plastic Ziploc baggie containing a gun and four bullets was found along a fence on Asbury Avenue. Two other bullets were also located in the grassy area between the baggie and the roadway, and a plastic bag of bullets was found further down the road near a telephone pole. The gun was a fully loaded Smith & Wesson .38-caliber revolver with a four-inch barrel.
On the next day, a third gun was recovered from Hope Road in Tinton Falls. This weapon, a .38-caliber revolver with a two-inch barrel, "contained two discharged shell casings and three live rounds of ammunition." The two discharged casings meant that the gun had "been fired at least two times."
Also on May 21, 1993, Lombardino's abandoned car was found in an industrial area in Brooklyn, New York. Its bottom back seat and license plates were missing. The car was removed to the Tinton Falls Police Department for further investigation.
*932 On June 9, 1993, defendant visited Lombardino, who was then being held at the Burlington County jail. Defendant, who indicated that he was a "friend" of Lombardino in the jail's visitor logbook, stayed for twenty-five minutes.
Line-ups were conducted on June 29, 1993. Defendant, Lombardino, Campisi and Gerry Giambanco were placed in the line-ups which were observed by five witnesses. There was one identification of Lombardino but none of the others. An observer of the shooting, who was not present at the line-up, subsequently identified Lombardino from a photo array. Rocco was not included in the line-ups because the FBI did not then believe that he was at the murder scene.
Within four months of Randazzo's murder, Rocco decided to cooperate with law enforcement. On January 20, 1994, Rocco, fitted with a body wire, recorded his conversation with Lombardino at a diner. In response to Lombardino's question whether Rocco had spoken to defendant, Rocco replied that he would probably see defendant on Sunday at a graduation. Lombardino, telling Rocco that they and defendant would have to develop an alibi with respect to Randazzo's murder stated: "We'll sit down . . . the three of us, and see how we're gonna handle this." To explain the presence of Randazzo's blood in Lombardino's car, Lombardino said that he would make up a false story that when he and Randazzo went out to lunch, Randazzo developed a bloody nose.
A ballistics expert determined that a discharged bullet found outside the driver's door of Randazzo's car and another recovered by the Medical Examiner from Randazzo's chest, were fired from the first weapon retrieved by the police, to the exclusion of other guns. He also determined that the two empty cartridge cases found in the third gun retrieved were fired from the third gun.
Comparing blood stains on Randazzo's shirt to a swatch of material taken from the rear driver's side door of Lombardino's car, Linda Harrison of the FBI concluded that the DNA profiles of both stains "matched."
Special Agent Jennifer Lindsey Smith of the FBI performed DNA tests upon the ten cigarette butts found in the rear of Lombardino's car. The first six were Salems, the next three were Ducados and the last was an unfiltered cigarette with no brand name. Two Salem butts and the unfiltered cigarette butts bore DNA consistent with that of defendant's DNA. Ninety-one percent of the Caucasian population, including Rocco and Lombardino, "would be excluded as the source of the saliva on those cigarette butts."

III.
On November 9, 1993, a federal grand jury in the Eastern District of New York charged defendant, Rocco, and two others, as "soldiers in the Colombo Family," with the November 15, 1988 murder of Angellino, conspiracy to murder Angellino "a member of the Colombo Family," and "using and carrying firearms." On February 1, 1994, Lombardino was indicted for his participation in the Randazzo murder by a federal grand jury in the District of New Jersey.
On March 18, 1994, Rocco entered into a "plea and cooperation agreement" with the United States Attorneys' Offices for the Eastern District of New York and for the District of New Jersey. The agreement reflected the acceptance by the government of a guilty plea from Rocco "to a one count criminal information charging him with conspiring to conduct the affairs of the Colombo Crime Family through a pattern of racketeering activity which included *933 three acts of conspiracy to commit murder." The agreement further provided for Rocco's cooperation with the government "concerning possible violations of the criminal laws, including particularly (but not limited to) homicides and organized crime schemes to infiltrate legitimate business and subvert government."
Notwithstanding the foregoing, the agreement also recited that
Rocco Cagno has expressed a strong unwillingness to testify against his brother, Aurelio "Ray" Cagno, even though he has identified Aurelio Cagno as having been a main participant in the Randazzo and Angellino murders. Recognizing this sensitivity, the Government agrees to make every reasonable effort to obviate the necessity of having to call Rocco Cagno as a witness against his brother, as a defendant. This provision does not, however, create any right on behalf of Rocco Cagno. Therefore, it is understood that if a good faith effort to develop alternative legally sufficient evidence is unsuccessful and, therefore, it becomes necessary to call Rocco Cagno as a witness against his brother in order to prevent a failure of justice, Rocco Cagno will be required to provide truthful testimony about the involvement of Ray Cagno in the planning and commission of the Randazzo and Angellino murders with others, in accordance with the provisions of this agreement and as otherwise required by law.
On May 5, 1994, Rocco entered a guilty plea in the United States District Court for the District of New Jersey to a one-count information charging him with racketeering conspiracy. The racketeering acts included: (1) the murder in 1976 or 1977 of "an unknown white male identified as a `loanshark customer' of Jimmy Randazzo"; (2) conspiracy to commit the November 1988 murder of Angellino; and (3) conspiracy to commit the 1993 murder of Randazzo.
Lombardino's federal trial in 1994 resulted in a mistrial. During a second trial, on October 4, 1994, Lombardino entered into a "plea agreement" whereby the government agreed to accept a guilty plea from him to a three-count criminal information charging: (1) "conspir[acy] to murder in aid of racketeering activity"; (2) "using and carrying a firearm during a crime of violence" and (3) "accessory after the fact . . . (destruction or removal of property to prevent seizure)." In return, the government promised that after Lombardino entered a guilty plea to the information and was sentenced, it would dismiss the pending indictment. However, there was no promise as to sentence, and the three terms could run consecutively.
An "Amendment to the Plea Agreement" also dated October 4, 1994, recited, in part, that
It is further agreed and understood that Count Two of the Indictment, charging a violation of 18 U.S.C. § 1959(a)(1) [conspiring to murder in aid of racketeering] can be reinstated in the event that Salvatore Lombardino should testify as a witness on behalf of Aurelio "Ray" Cagno concerning the subject matter of this Information, namely the conspiracy and murder of James Randazzo.
On February 1, 1995, Lombardino was sentenced to prison for consecutive sentences aggregating seventeen years.
On November 27, 1995, defendant entered a guilty plea to racketeering conspiracy in the Eastern District of New York. During his allocution, defendant stated that he "conspired with others," that he "was available to facilitate the unlawful act," and did so to maintain his "position in [an] association [with the Colombo Family]." Defendant admitted conspiring to *934 kill Angellino, but refused to name any co-conspirators and stated that he was "not privy to whatever activities some people may or may not have been involved in." He expressly said "I am not naming the people in the indictment" and "not allocating [sic] to anyone else's involvement." Defendant was sentenced to five years' imprisonment on January 31, 1997.
In the interim, on March 7, 1996, Rocco was sentenced to five years' probation. At the sentencing hearing, Rocco's cooperation in connection with the Lombardino case was lauded by FBI Special Agent Marchalonis. Marchalonis stated that Rocco's "testimony was responsible for the FBI solving the first mob hit [the Randazzo killing] . . . in the history of the Newark office," and that law enforcement "definitely need people like Mr. Cagno to come forward."
On May 1, 1998, Lombardino appeared before a New Jersey federal grand jury in connection with its investigation into Randazzo's death. At the outset of the proceedings, Mark Rufolo, the Assistant United States Attorney (AUSA) who negotiated the prior Lombardino and Rocco Cagno pleas, told Lombardino that he had been granted immunity by a District Court Judge and that he was compelled to truthfully answer questions. Lombardino was further advised that if he failed to answer questions he could be held in contempt and that if he answered falsely he could be charged with perjury or obstruction of justice.
Lombardino acknowledged that he and Rocco were involved in Randazzo's murder but refused to implicate defendant. He said he did it "because [he] feared for [his] life." Although Lombardino admitted that he was "a member of the Colombo family of La Cosa Nostra," he testified that he was not "too sure" if Randazzo was a member and "refused" to testify about Sal Profaci's role in the Family. At several points Lombardino refused to answer questions about the Family and people in it, and "refused to answer" if defendant was involved in planning Randazzo's murder. In other words, Lombardino only implicated himself and Rocco Cagno, who had already entered a guilty plea pursuant to an agreement with federal authorities regarding Randazzo's death.
On May 8, 1998, upon application of the government, Federal District Judge Nicholas Politan held Lombardino in contempt for "having refused to fully comply with the order given to him by the Grand Jury to testify and answer all questions." Nevertheless, at an October 8, 1998 deposition conducted by the Unites States Attorney at the facility where Lombardino was incarcerated, Lombardino continued his refusal to implicate defendant. He repeatedly "refused to answer" the questions asked.[2]
On December 4, 1998, Rocco appeared before a federal grand jury in New Jersey. He acknowledged his testimony at Lombardino's trial, during which Rocco testified about his own involvement and the involvement of Lombardino in "the Colombo family of La Cosa Nostra" and in Randazzo's murder. He had refused to implicate his brother at the time, but had now changed his position and was "willing to testify in a case brought against Ray Cagno."
In a December 28, 1998 letter, Rufolo wrote to EDNY Judge Allyne Ross that Rocco reversed his previous position of refusing to testify against defendant, and *935 that "New Jersey intend[ed] to proceed" with a state or federal prosecution against defendant because they could proceed with proofs independent of his plea in the EDNY.
At defendant's first State trial, Rufolo, who had been designated a Special Deputy Attorney General to try the case, indicated that he intended to call Lombardino as a witness. Out of the presence of the jury, Lombardino relied upon his Fifth Amendment privilege in response to Rufolo's questions. Rufolo then served Lombardino with a petition and a proposed order to compel testimony. On June 13, 2002, after the judge granted Lombardino immunity, she held him in contempt upon his failure to testify after being ordered to do so. Also out of the jury's presence, the contempt order was extended on June 18, 2002, upon Lombardino's continued refusal to testify.
FBI Special Agent Stephen Kodak was present at defendant's first criminal trial on June 13 and June 18, 2002. At the second trial, Kodak testified about Lombardino's refusal to testify at the first trial and the ensuing contempt proceedings. Specifically, Kodak testified that Lombardino refused to answer questions relating to Randazzo's murder at the Tinton Falls Holiday Inn on May 17, 1993, and his knowledge of the Colombo Crime Family. Kodak did not mention anything about Lombardino's reliance upon his Fifth Amendment privilege.
Kodak also testified that when Lombardino walked into the courtroom on June 13, 2002, he "smiled" at defendant and defendant "smiled back." As Lombardino left the courtroom after refusing to testify and being held in contempt, he "gave [defendant] a thumb's up sign and said hang in there kid." According to Kodak, defendant "smiled back." When Lombardino left the courtroom on June 18, 2002, he gave defendant another "thumbs up" sign.
Monmouth County Sheriff's Officer Benjamin Rivera-Estrada was present at defendant's first trial on June 18, 2002. He also testified that Lombardino refused to answer questions. According to Rivera-Estrada, as Lombardino exited "he looked over at Mr. Cagno, gave him kind of a small smile, wink and head nod with a thumbs up sign," and said "keep your head up, kid. Keep it up, kid or words to that effect." According to Rivera-Estrada, defendant "[s]miled and just nodded his head."

IV.
Defendant argues that the judge "committed reversible error in refusing to charge conspiracy to commit murder as a lesser-included offense of murder." In response to defense counsel's request for such a charge the judge stated that she determined that "[c]onspiracy to commit murder is not a lesser included charge."[3]
A conspiracy to commit an offense may be a lesser included offense to be presented to the jury if the evidence so warrants. N.J.S.A. 2C:1-8(d). However, N.J.S.A. 2C:1-8(e) provides that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Therefore, in order to justify an instruction on a lesser included offense, including conspiracy, "a rational basis [must exist] in the evidence for a jury to acquit the defendant of the charged offense before the court may instruct the jury on an uncharged offense." State v. Brent, 137 N.J. *936 107, 113-14, 644 A.2d 583 (1994). See also State v. Cassady, 198 N.J. 165, 178, 966 A.2d 473 (2009); State v. Savage, 172 N.J. 374, 397-98, 799 A.2d 477 (2002).
Defendant contends that "[w]hile the jury might have accepted Rocco's testimony about the conspiracy, it had every reason to doubt whether defendant was actually present at the shooting" of Randazzo. In support, defendant contends there is no physical evidence connecting him with the crime, and three of the four eyewitnesses gave descriptions that did not match defendant's. However, as the Supreme Court stated in State v. Bridges, 133 N.J. 447, 468, 628 A.2d 270 (1993):
[A] conspirator can be held liable for the acts of others that constitute a reasonably foreseeable risk arising out of the criminal conduct undertaken to effectuate the conspiracy, and occurring as the necessary or natural consequences of the conspiracy. The substantive crime must be reasonably and closely connected to the conspiracy even though those crimes may not have been within the actual contemplation of the conspirators or within the scope of the conspiracy as originally planned.
Thus, "`[c]onspirators are treated as accomplices under N.J.S.A. 2C:2-6, and hence are guilty of the same substantive offense as the principal.'" State v. Taccetta, 301 N.J.Super. 227, 243, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 188, 704 A.2d 18 (1997) (quoting State v. Curry, 109 N.J. 1, 9, 532 A.2d 721 (1987)). See also State v. Stein, 70 N.J. 369, 389, 360 A.2d 347 (1976) (although he was not present at the crime scene, defendant was guilty of an armed robbery which "was within the scope of the conspiracy to steal currency from the Gordon home").
Here, we conclude that the trial judge properly declined to charge conspiracy to murder as a lesser included offense to murder "because, in the circumstances presented, there was no rational basis" for the charge. Cassady, supra, 198 N.J. at 169, 966 A.2d 473. Even if the jury believed that defendant was not an active participant at the scene, but found him to be a co-conspirator in the murder, defendant would have been guilty of the substantive murder offense because the clear object of the conspiracy to kill Randazzo was accomplished. Thus, there was no rational basis on which to acquit defendant of the murder charge and to convict him only of a conspiracy on that count. See Brent, supra, 137 N.J. at 113-14, 644 A.2d 583.
In addition, Rocco's testimony was essential to both factual determinations that defendant conspired to kill Randazzo and that he actively participated in the murder. The jury had no rational basis to credit Rocco's testimony in one respect, but not the other.

V.

A.
Defendant contends that a judgment of acquittal should have been entered on the conspiracy to commit racketeering count at the trial because there was no proof the conspiracy continued within the five-year statute of limitations. Defendant argues that the State did not prove at the first trial that he or anyone else conspired to assist the Colombo Family in any criminal act after January 20, 1994, the date of Rocco's taped meeting with Lombardino at the diner when Lombardino suggested that defendant, Rocco and he develop an alibi for the Randazzo murder. Defendant also argues the proofs within five years of the statute of limitations, specifically Lombardino's conduct at the first trial, were inadmissible at the second. Defendant adds that the State in the first indictment *937 "sought to avoid the statute of limitations by citing Salvatore Lombardino's refusal to answer `certain questions concerning the involvement of another person' in 1998 as an overt act." Defendant further notes that since "[t]he judge later ruled that that refusal to testify was not done in furtherance of the conspiracy, . . . the statute of limitations would have expired in early 1999," five years after the January 1994 meeting and before the first indictment was returned in February 2000.
Defendant also asserts that, because the 2003 superseding indictment did not allege that the co-conspirators had done anything to further the conspiracy from January 1994 to June 2002, the State improperly circumvented the statute of limitations by alleging in the superseding indictment that the conspiracy continued as evidenced by Lombardino's refusal to testify at defendant's first trial and his gestures to defendant while in the courtroom. The State counters that
Defendant overlooks the ongoing nature of this racketeering conspiracy whereby concealment of its criminal activities from law enforcement was alleged and proven [Lombardino's silence and "encouragement" at defendant's first state criminal trial] as a major objective of the conspiracy.
Prior to his first trial, defendant moved to dismiss the original conspiracy indictment on statute of limitations grounds. Defendant maintained that the State had not alleged any overt acts advancing the conspiracy during the relevant time period. He asserted that the overt act alleging Lombardino's May 1, 1998, refusal "to answer certain questions" before the federal grand jury and Lombardino's subsequent refusal to answer these questions in a deposition conducted by AUSA Rufolo, were not overt acts and must be excluded. As a result, defendant asserted that the racketeering conspiracy count had to be dismissed on statute of limitations grounds.
The trial judge denied the motion, stating:
Although the conspiracy statute does not require proof of an overt act, the Statute of Limitations will bar an action for RICO conspiracy against an individual unless he or she continues as a co-conspirator and another conspirator acted within the five year period. [Citation omitted].
Because the Court found Count One of the Indictment is supported even without the alleged overt acts of 1998, the question of whether those overt acts must be eliminated from the indictment need not be resolved.
Count One of the Indictment . . . charges a RICO conspiracy not a murder conspiracy. It alleges that the Defendant, and others, from about the mid 1980's, up through October, 1998, conducted the affairs of a secret [organization] through a pattern of racketeering activity consisting of various criminal acts, including illegal gambling, extortion and murder.
The prosecution of this charge was commenced in 2000, well within the five year statutory period which commenced after the crime was committed, which in this case was not until acts of concealment that were central [to] the charged RICO conspiracy were committed.
As we will discuss, this ruling was correct.
After the mistrial and prior to his second trial, defendant again moved to dismiss the superseding indictment on statute of limitations grounds. Defendant contended, among other things, that the State manufactured Lombardino's contemptuous conduct during the first trial by requiring him to testify knowing that he would not. As also noted above, this conduct at the *938 2002 trial provided the basis for overt acts four and five of the superseding indictment.
In declining to dismiss the conspiracy count of the superseding indictment the judge stated:
Now in this case the Federal plea agreement originally restricted Mr. Lombardino from testifying on the defendant's behalf. Nonetheless, he was released from this condition. And clearly he's not prohibited from offering truthful testimony after his release from the Federal plea agreement, which was nearly one year before the defendant's first trial.
So the contention that the State manufactured those overt acts by placing Lombardino in a catch-22 position is invalid. Mr. Lombardino had already been sentenced for his participation in the crimes. He was granted immunity for any statements made during [sic] truthful testimony in the defendant's trial. And he was formally released from the no-testimony requirement in his plea agreement.
But nevertheless, he voluntarily chose not to answer questions regarding the defendant's role in the Randazzo murder.
. . . I find that the State has not engaged in misconduct that would require a dismissal of the [superseding] indictment.. . .
More specifically regarding the statute of limitations, the judge added:
You don't need overt acts in a conspiracy.. . .
Now in [Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L. Ed.2d 931 (1957)], . . . the Supreme Court said, "There is a distinction between acts of concealment done in furtherance of the main criminal objects of the conspiracy, and acts of concealment done after the central objectives have been obtained for the purpose only of covering up after the crime. The former can be considered part of the criminal conspiracy, the latter cannot."
. . . .
. . . the State has the burden to establish evidence for which it can be shown or implied that there was an expressed original agreement among the co-conspirators to act in concert in order to cover-up for their own self protection.
Now, clearly, the State alleges Lombardino's contempt was in furtherance of the conspiracy. The defendant asserts that the Col[o]mbo crime family has been defunct for a period outside the five year statute of limitations. And in other words that the defendant alleges the contempt was merely to conceal the completed crimes.
Now the issue of whether Lombardino's contempt was done in furtherance of the main criminal objectives of the conspiracy or done for the purpose only of covering-up after the crime, is one of fact for the jury to decide.

(Emphasis added.)
In denying defendant's motion for judgment of acquittal at the end of the State's case at the second trial, the judge stated the following with respect to the statute of limitations:
I do not believe that . . . the statute of limitations is an issue for a jury. Nevertheless, I think that the State has proven a prima facie case when it comes to conspiracy. They have shown acts four and five. Now, whether or not the jury wants to believe acts four and five, whether they even happened is number one. Or if they did happen, if they mean anything.
But there was testimony about this wink, this nod, this, hang in there, kid. *939 There was also testimony by Mr. [Newsome] that there is this what we call omerta. This belief that there's a secrecy. There is some kind of blood oath that people involved in this conspiracy subscribe to. And the jury could very well believe that this was in furtherance of that conspiracy.
There's also testimony that Mr. Lombardino, after having been granted immunity from prosecution, still refused to testify. I think that shows that there may be a conspiracy and it shows that the State has proven a prima facie case.
N.J.S.A. 2C:1-6(b)(1) provides that "[a] prosecution for a crime must be commenced within five years after it is committed." "The period of limitation does not run during any time when a prosecution against the accused for the same conduct is pending in this State." N.J.S.A. 2C:1-6(e). In New Jersey the statute of limitations for a RICO conspiracy is five years after its commission. N.J.S.A. 2C:1-6(b)(1). "An offense is committed either when every element occurs" or "when the course of conduct or defendant's complicity therein is terminated." N.J.S.A. 2C:1-6(c).
We need not decide whether the tolling provisions of N.J.S.A. 2C:1-6(e) apply because the trial judge declined to dismiss the indictment returned in 2000. Defendant challenged the overt act in the first indictment based on the 1998 appearance of Lombardino, and the issue projected by the appearance is the same as the issue presented by his appearance at the first trial in 2002.[4] In other words, defendant argues that the State did not meet its burden of proving a conspiracy continued to within the applicable statute of limitations of either indictment.
In United States v. Yannotti, 541 F.3d 112 (2d Cir.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1648, 173 L.Ed.2d 999 (2009), the defendant, a Gambino crime family soldier, challenged his conviction for participating in a RICO conspiracy on the ground that there was no evidence that he engaged in two timely acts of racketeering (securities or construction industry fraud), because the only racketeering act committed by him (loansharking) fell outside the statute of limitations. Id. at 119, 122. As to conspiracy, the court stated:
It is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside of the scope of the illegal agreement. "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." [Salinas v. United States, 522 U.S. 52, 63-64, 118 S.Ct. 469, 139 L. Ed.2d 352 (1997).]
[Id. at 122.]
Specifically, with respect to Yannotti, the court wrote:
[T]he evidence showed that Yannotti was formally inducted as a "soldier" into the Gambino Crime Family at a ceremony in which inductees pledged themselves to use any means necessary to further the objectives of the Family. A reasonable jury could certainly conclude *940 that when Yannotti agreed to participate in the affairs of the Gambino Family, he was by no means limiting that participation to his own loansharking. Instead, it could have found that Yannotti had agreed that he, and others, would engage in a jointly undertaken pattern of racketeering activities reaching all of the predicates established by the government. Thus, the fact that the government did not prove Yannotti's specific knowledge of or participation in each predicate act conducted by other members of the Gambino Family does not undermine the sufficiency of the evidence establishing his conviction as to the charged RICO conspiracy.
[Ibid.]
As to the statute of limitations, the court further held:
Although a "substantive RICO charge is barred by limitations as to any defendant unless that defendant committed a predicate act within the five-year limitations period," a RICO conspiracy "is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned." United States v. Salerno, 868 F.2d 524, 534 (2d Cir.1989) cert. denied, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed 2d 700 (1989) (emphasis in original), [cert. denied, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989)]. Accordingly, even if a defendant engaged in predicate conduct that occurred outside of the statute of limitations, that defendant remains liable for RICO conspiracy unless the evidence shows that the conspiracy concluded or he withdrew from that conspiracy more than five years before the indictment. See id.; Persico, 832 F.2d at 713. This is because once the government meets its burden of proof to establish a RICO conspiracy, "it is entitled to a presumption that the conspiracy continued until [the] defendant demonstrate[s] otherwise." United States v. Spero, 331 F.3d [57,] 61 [(2d Cir.2003)].
[Id. at 123 (emphasis added.)]
Thus, the core issue to be determined is when or if the object of the conspiracy had been accomplished more than five years before the indictment was returned, and when or if the conspiracy had been abandoned by defendant. See ibid.
In Grunewald, the Supreme Court held that concealment to avoid detection after the object of the conspiracy had been attained does not extend the statute of limitations:
[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.. . . Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators. For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases. . . .
[Grunewald, supra, 353 U.S. at 401-02, 77 S.Ct. at 972, 1 L.Ed.2d at 942.]
The Grunewald Court, however, added the following significant language:

*941 By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.
[Id., 353 U.S. at 405, 77 S.Ct. at 974, 1 L.Ed.2d at 943.]
Moreover, "[t]he ultimate question of whether acts are in furtherance of the conspiracy or only for purposes of concealment depends on the objectives of the conspiracy, a determination of which is a question of fact for the jury." United States v. Cannistraro, 800 F.Supp. 30, 78 (D.N.J.1992), aff'd in part and vacated in part and remanded, 40 F.3d 1384 (3d Cir. 1994).
Our RICO jurisprudence accepts "guidance" from the federal RICO cases. State v. Ball, 268 N.J.Super. 72, 98, 632 A.2d 1222 (App.Div.1993), aff'd, 141 N.J. 142, 661 A.2d 251 (1995), cert. denied sub nom. Mocco v. New Jersey, 516 U.S. 1075, 116 S.Ct. 779, 133 L. Ed.2d 731 (1996); State v. Bisaccia, 319 N.J.Super. 1, 20-21, 724 A.2d 836 (App.Div.1999). Moreover, our RICO Act was derived from the federal act, and ours "essentially incorporated relevant federal case law with respect to the federal act." State v. Sparano, 249 N.J.Super. 411, 423, 592 A.2d 608 (App.Div.1991). Based thereon, we agree with the State that the jury could have found defendant guilty of conspiracy at the second trial.
Lombardino's contemptuous silence in the face of granted immunity at defendant's trial in June 2002, together with his words and gestures of encouragement to defendant, could properly have been considered acts of concealment in furtherance of the overall Colombo conspiracy to which defendant, Lombardino and Rocco pledged their lives.[5] Silence is the hallmark of La Cosa Nostra's operations, as developed in the evidence, and a jury could find that Lombardino's silence furthered the conspiracy through at least June 2002. As noted in United States v. Gigante, 925 F.Supp. 967, 970 (E.D.N.Y. 1996):
Induction as a Member of a Family is coveted [by participants]. It is [considered by participants] an honor as well as a harbinger of large increases in income. But admission entails responsibilities. It requires, among other things, taking an oath of omerta, that is, an oath to remain silent to the outside world about the criminal affairs of the Family, never to betray anyone in the crime Family or in organized crime, and never to reveal to law enforcement personnel anything that might incriminate anyone in organized crime. The penalty for violation of this oath is death.
In the organized crime setting, therefore, respect for the pledge of silence can be seen as furthering the conspiracy, not merely as an endeavor to conceal or cover-up a prior conspiracy. Recent cases support the proposition that the refusal to testify, when there is no longer a Fifth Amendment privilege to refuse, and a signal such as a "thumbs ups" or similar gesture can be understood, and is admissible, as evidencing an on-going conspiracy. See State v. Barone, 329 Or. 210, 986 P.2d 5, 21 (1999), cert. denied, 528 U.S. 1086, 120 S.Ct. 813, 145 L.Ed.2d 685 (2000) (witness's sentence and appeal, when he no longer had a Fifth Amendment privilege to refuse to testify, could support *942 inference that the "refusal to testify was motivated by a desire to protect defendant."); United States v. Harman, 66 M.J. 710, 711-15 (A.Ct.Crim.App.2008), review granted 2009 CAAF Lexis 619 (C.A.A.F. 2009) (photo of military police officer with "thumbs up" admissible as evidence of "approval and encouragement to her co-conspirators as they maltreated the prisoners"); see also, e.g., U-Haul Co. of Nev., Inc. v. NLRB, 490 F.3d 957, 964 (D.C.Cir. 2007) (gesture could be understood to "encourage support for the union"). Moreover, and perhaps more important, "where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." United States v. Coia, 719 F.2d 1120, 1125 (11th Cir.1983) (quoting United States v. Mayes, 512 F.2d 637, 642 (6th Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975)). See also State v. Taccetta, supra, 301 N.J.Super. at 253, 693 A.2d 1229.[6] "The conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished." Coia, supra, 719 F.2d at 1124.

B.
Defendant also argues that his involvement in the conspiracy terminated by the arrest and conviction of all his co-conspirators, and he "withdrew from the conspiracy by pleading guilty" to federal racketeering charges involving the murder of Angellino. Hence, he asserts the indictments were time-barred on that basis. The State responds that "[b]ecause defendant failed to present any evidence that he withdrew from this conspiracy, the statute of limitations never began to run on the racketeering conspiracy count."
Defendant argues that his 1995 guilty plea to federal racketeering charges arising out of the murder of Angellino signaled his abandonment of the conspiracy. However, N.J.S.A. 2C:5-2(f)(3) provides for the termination of an individual's participation in a conspiracy "only if and when he advises those with whom he conspired of his abandonment or he informs the law enforcement authorities of the existence of the conspiracy and of his participation therein." "Mere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal. The defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." United States v. Steele, 685 F.2d 793, 803-04 (3d Cir.), cert. denied, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir.1987) (citing Hyde & Schneider v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)), ("withdrawal requires affirmative action; a disclosure to authorities may not suffice if the disclosure is incomplete and defendant continues to acquiesce in the conspiracy"). See also Coia, supra, 719 F.2d at 1124.
On November 27, 1995, defendant pled guilty to racketeering conspiracy only with respect to the Angellino murder. His plea did not cover the Randazzo murder, a significant aspect of the racketeering conspiracy alleged in the superseding indictment.[7] Moreover, defendant during his *943 plea allocution refused to name other conspirators to the Angellino murder. He acknowledged his acts as a member of the Colombo crime family, but added he was "not privy to whatever activities some people may or may not have been involved in." Therefore, it cannot be said that defendant made a "full disclosure" to authorities to constitute his abandonment of the conspiracy in 1995 within the meaning of N.J.S.A. 2C:5-2(f)(3).
Since the conspiracy lasted at least through June 2002 when Lombardino refused to testify at defendant's first trial, and there was an insufficient showing of abandonment by defendant, the racketeering conspiracy charge contained in the January 2, 2003, superseding indictment was not subject to dismissal on statute of limitations grounds.
The second trial, of course, would not have been reached if there was no proof at the first trial of a conspiracy within the limitations period of the first indictment, and jeopardy precluded a retrial. However, we conclude, as did the trial judge, that the presumption of a continuing conspiracy warranted denial of the judgment of acquittal at the conclusion of the first trial.[8] The nature of the Colombo enterprise and the presumption of a continuing conspiracy would permit the trial judge to hold that the racketeering conspiracy had not terminated. See Yannotti, supra, 541 F.3d at 121. See also United States v. Persico, 832 F.2d, 705, 712-14 (2d Cir.1987) (sufficient evidence of continued participation in family enterprise despite defendants' guilty pleas; statute of limitations for RICO conspiracy does "not begin to run until the accomplishment or abandonment of the objectives of the conspiracy"; conspiracy, unlike substantive RICO acts, does not require proof of predicate act within five years of indictment). We, therefore, examine the issues before us only in the context of the second trial which resulted in defendant's convictions.

VI.
The State acknowledges, "`[w]hether acts can be construed as committed in furtherance of the conspiracy or only for purposes of concealment depends on the objectives of the conspiracy' which is a question of fact for a jury," quoting Unites States v. Young & Rubicam, Inc., 741 F.Supp. 334, 343 (D.Conn.1990); see also Cannistraro, supra, 800 F.Supp. at 78. The issue then becomes whether the jury was sufficiently advised that it had to find that the gesture and silence constituted an act in furtherance of the conspiracy, or alternatively, that the conspiracy continued within the five year period in some other way. After all, Lombardino's conduct was the only acts alleged or developed as occurring within the five-year statute of limitations.
Defendant contends that the jury charge on the statute of limitations and other issues was erroneous and warrants reversal. Specifically, defendant raises four arguments in support of his attack on the racketeering conspiracy charge: (1) the "charge misstated the law relating to the statute of limitations and allowed the jury to convict based on acts [that] occurred after the statute . . . had expired"; (2) the charge "was legally incorrect in stating that a conspiracy could `only' be terminated when it was `abandoned' by defendant"; (3) the statute of limitations charge violated defendant's due process rights because it shifted the burden of proof to him; and *944 (4) the judge erred "in refusing to allow the jury to decide whether Lombardino's refusal to testify was in support of the main objectives of the conspiracy."
The judge initially charged the jury:
In order to find the defendant guilty of Count One, you must find beyond a reasonable doubt that the racketeering conspiracy did not terminate prior to January 2, 1998, which is five years prior to the date of the indictment.
In other words, proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality of the conspiracy after January 2nd must be found. And the State has alleged certain overt acts and those overt acts were . . . the Angellino murder in 1988; the 1993 murder of James Randazzo; the meeting in January 1994 between Rocco Cagno and Lombardino where they discussed the plan to form their alibis; the June 13, 2002 court proceeding whereby Mr. Lombardino refused to testify and that June 18, `[02] court proceeding where Mr. Lombardino refused to testify. So those are the overt acts that the State alleges.
Again, in other words, beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some evidence of the vitality of the conspiracy after June 2, 1998 [sic January] must be found.

In this regard, I instruct you that the conspiracy is a continuing course of conduct [that] will only terminate when the agreement to conduct the affairs of the racketeering enterprise through a pattern of racketeering activities is abandoned by the defendant and by those . . . with whom he conspired.
[An] individual abandons the agreement by advising those with whom he conspired of his abandonment or inform[s] law enforcement authorities of the existence of the conspiracy and his participation in the conspiracy. However, in that case, the conspiracy is terminated only as to that individual who abandons the conspiracy.
The State is not required to prove that an overt act occurred after January 2, 1998. The State however must prove beyond a reasonable doubt that the conspiracy continued after January 16, [sic] 1998.
During deliberations, the judge considered a note received from the jury on the previous day requesting: (1) a review of the elements necessary for racketeering conspiracy and, (2) "the significance of the June 1998 date with respect to count one."
After recharging the jury with respect to the elements of a conspiracy, the judge instructed the jury:
As to question two, your question was, "What is its significance of the June 1998 date with respect to count one". Well, it is not June, it is January 1998. So you have the wrong date there.
In order to find the defendant guilty of count one, you must also find beyond a reasonable doubt that the conspiracy to commit racketeering did not terminate prior to January, not June 2, 1998, which is five years prior to the date of the indictment. So there is no particular significance in the January 1998 date in the context of evidence that you heard other than it happens to be five years prior to the date that the indictment was returned.
In other words, proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality or existence of a conspiracy after January 2nd 1998, must be found.
*945 In response to a juror's request for a re-reading of the last sentence, the judge re-read the last two paragraphs just quoted, discussed the five alleged overt acts, and re-stated:
Now in this regard, I instruct you that a conspiracy is a continuing course of conduct which only terminates when the agreement to conduct the affairs of the racketeering enterprise through a pattern of racketeering activity is abandoned by the defendant and by those with whom he conspired.
An individual abandons the agreement by advising those with whom he conspires of his abandonment or inform[s] law enforcement authorities of the existence of the conspiracy and his participation in the conspiracy. However, in that case the conspiracy is terminated only as to that individual who abandons the conspiracy.
The State is not required to prove that an overt act occurred after January 2, 1998. The State, however, must prove beyond a reasonable doubt that the conspiracy continued after January 2nd 1998.
In this case the State, even though not required, has alleged four [sic five] overt acts to include acts that allegedly occurred in June 2002, that is, the two times that Mr. Lombardino would not testify at another proceeding.
If you find beyond a reasonable doubt that an act occurred in June 2002 and that it was in furtherance of the charged conspiracy, then that should be considered in your determination whether or not the conspiracy continued after January 2nd 1998.
(Emphasis added.)
Noting that the jurors had raised their hands and expressed "some puzzled looks," the judge again re-read what she had charged regarding the need for proof that the conspiracy continued beyond January 2, 1998. She emphasized there must be "proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality or existence of the conspiracy after January 2nd 1998 must be found." She re-charged on the concept of "continuing course of conduct" and abandonment, and ended by saying:
The State is not required to prove that an overt act occurred after January 2nd 1998. However, the State must prove beyond a reasonable doubt that the conspiracy continued after January 2nd 1998.
On the same day, the jury asked for a list of the overt acts to be considered in Count One. The jury further asked that if Lombardino's two acts of refusing to testify "in this courtroom, are among those listed[,] . . . [m]ust these acts be considered in total; i.e. can the failure to testify be considered without the alleged communication between Mr. Lombardino and the defendant?" After again reading the five overt acts contained in the superseding indictment, the judge stated:
As I told you earlier, the State is not required to prove an overt act in an offense that alleges conspiracy to commit racketeering; however, the State must prove the vitality of the existence of the conspiracy to commit racketeering through some other evidence. Therefore, you may consider the alleged overt acts as charged or any other evidence including any evidence presented in the context of the alleged overt act that you believe prove the vitality or existence of the conspiracy to you beyond a reasonable doubt.
The judge was correct. As previously noted, an overt act, as such, need not be proven and there is a presumption *946 that the conspiracy continues. See Coia, supra, 719 F.2d at 1124. See also N.J.S.A. 2C:5-2(d) (regarding the lack of need to prove an overt act with respect to a conspiracy to commit a first or second degree crime).
In Persico, supra, 832 F.2d at 713, the Second Circuit agreed with the District Court's Judge's holding "that the statute of limitations for RICO conspiracy should not begin to run until the accomplishment or abandonment of the objectives of the conspiracy." The court wrote:
In order to convict a defendant of RICO conspiracy, only an agreement to commit two or more predicate acts, rather than the acts themselves, need be proven. By his agreement, a RICO defendant signals his membership in a conspiracy to conduct the affairs of the charged enterprise. Thus, the RICO conspiracy statute is most closely analogous to other conspiracy statutes pursuant to which overt acts in furtherance of the conspiracy need not be pleaded or proven. Under such statutes, for limitations purposes, the conspiracy may be deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed.
The statute of limitations applicable to RICO conspiracy provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years after such offense shall have been committed." 18 U.S.C. § 3282 (1982). The limitations period is measured from the point at which the crime is complete. Because the RICO conspiracy statute does not require proof of an overt act, we believe that the crime of RICO conspiracy is not complete until the purposes of the conspiracy either have been accomplished or abandoned. . . . Although proof of a RICO conspiracy requires a demonstration that a defendant agreed to commit two or more predicate acts, rather than a simple showing that the defendant agreed to join the conspiracy, the agreement proscribed by section 1962(d) is conspiracy to participate in a charged enterprise's affairs, not conspiracy to commit predicate acts. We perceive no valid reason why the RICO conspiracy statute should be analyzed in a manner inconsistent with other conspiracy statutes not requiring proof of overt acts.
Based on the foregoing, we conclude that the statute of limitations for the RICO conspiracy charges at issue here did not begin to run at least until the filing of the indictment. As Judge Keenan noted, the government amply demonstrated that the conspiracy to conduct the affairs of the Colombo Family continued until, and well after, April 4, 1985, the date the superseding indictment was filed.
[Ibid. (some citations and internal quotes omitted).]
Persico was followed by Salerno, supra, 868 F.2d at 524. In that case the defendant Anthony Indelicato was indicted on RICO conspiracy and substantive RICO charges on November 19, 1985. Id. at 534. Evidence adduced at trial established that the "Commission" was "the ultimate ruling body over the five La Cosa Nostra families in New York City and affiliated families in other cities," and its purpose was "to regulate and facilitate the relationships between and among the several La Cosa Nostra families." Id. at 528. Since three of Indelicato's alleged racketeering acts occurred in 1979, more than five years before the indictment was returned, he contended that his conviction on both the RICO conspiracy and substantive counts were barred by the five-year statute of *947 limitations. Id. at 534. With respect to the RICO conspiracy count, the jury was charged that it must find "that the Commission enterprise continued to exist after November 19, 1980, and that Indelicato continued after that date to be a coconspirator or associate of that enterprise." Ibid. Holding that the jury was properly charged on the RICO conspiracy count, the Second Circuit noted:
Subsequent to oral argument, this court decided in United States v. Persico, 832 F.2d 705 (2d Cir.1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), that a RICO conspiracy offense is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned, id. at 713,[[9]] . . . .

The jury here was properly charged that the conspiracy count against Indelicato must be dismissed on statute of limitations grounds unless they found that the Commission enterprise continued after November 19, 1980, [five years before the indictment was returned] and that Indelicato continued after that date as a coconspirator or an associate of that enterprise. There was ample evidence to support its determinations adverse to Indelicato on those issues.
[Id. at 534 (emphasis added).]
N.J.S.A. 2C:41-2(d), of which defendant was convicted, makes it "unlawful for any person to conspire as defined by N.J.S.[A.] 2C:5-2, to violate any of the provisions of [N.J.S.A. 2C:41-2]." The statute is similar to 18 U.S.C.A. § 1962(d), the conspiracy provision of the federal RICO statute; so we borrow from federal law in interpreting the statute, particularly because N.J.S.A. 2C:5-2(d) requires no proof of an overt act for a first or second-degree crime. See also Ball, supra, 268 N.J.Super. at 98, 632 A.2d 1222; Bisaccia, supra, 319 N.J.Super. at 20-21, 724 A.2d 836.
N.J.S.A. 2C:5-2(f)(1) provides that, for the purpose of applying the limitations period of N.J.S.A. 2C:1-6(d), "[c]onspiracy is a continuing course of conduct which terminates when the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he conspired." Other than a crime of the first or second degree, abandonment is presumed "if neither the defendant nor anyone with whom he conspired does any overt act in pursuance of the conspiracy during the applicable period of limitation." N.J.S.A. 2C:5-2(f)(2). But where the crime of which defendant was convicted was of the first or second degree, the presumption of abandonment does not apply in the absence of proof of an overt act within the period of limitations. As we noted previously, "[i]f an individual abandons the agreement, the conspiracy is terminated as to him only if and when he advises those with whom he conspired of his abandonment or he informs the law enforcement authorities of the existence of the conspiracy and of his participation therein." N.J.S.A. 2C:5-2(f)(3). See also Final Report of the New Jersey Law Revision Commission, Commentary, § 2C:5-2, at 143 (October 1971).
The charge as a whole was consistent with the relevant case law which provides that a conspiracy offense is complete as to a particular defendant only when the object *948 of the conspiracy has been accomplished or when that individual abandons the conspiracy. The jury was properly instructed that, while the State is not required to prove that an overt act was committed after January 2, 1998, the State had the burden of proving beyond a reasonable doubt that the racketeering conspiracy continued to within five years of the indictment, and did not terminate prior to January 2, 1998, and that the conspiracy continued after that date. The jury was further charged that "proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality or existence of a conspiracy after January 2nd 1998, must be found." In effect, the judge told the jury that the State had the burden of establishing beyond a reasonable doubt that the Colombo racketeering conspiracy continued beyond January 2, 1998, and that defendant remained a conspirator.
In addition, the judge properly charged the jury as to how a conspiracy could be abandoned by an individual co-conspirator. It is understandable that defendant did not want the jury informed about his federal racketeering conviction premised upon the Angellino murder as a basis for his argument that he abandoned the conspiracy. The jury did not learn that defendant pled guilty to a crime involving the Angellino murder.
Defendant argues that the statute of limitations charge violated his due process rights "by shifting the burden of proof to him." He points to a small portion of the charge that states that "conspiracy is a continuing course of conduct which will only terminate when the agreement to conduct the affairs of the racketeering enterprise. . . is abandoned by the defendant and by those . . . with whom he conspired." Defendant argues that
[U]nder the instruction, once a conspiracy is proven, it is presumed to continue until the defendant proves abandonment. As noted, not only does the defendant bear the burden of demonstrating that he has abandoned the conspiracy prior to the effective date of he statute of limitations, he must prove that it was abandoned "by those . . . with whom he conspired."
However, the charge must be read as a whole, and the jury was repeatedly told that the State had to "prove beyond a reasonable doubt that the racketeering conspiracy did not terminate" prior to January 2, 1998, or that it continued after that date. The jury was repeatedly told that defendant had no burden to prove anything. The jury was also repeatedly advised that the State had to prove five elements to sustain the conspiracy conviction:
To summarize, the essential element that the State must prove beyond a reasonable doubt with respect to Count One are: (1) That an enterprise existed; (2) That the enterprise engaged in trade or commerce, or its activities affected trade or commerce. (3) The defendant was employed by or associated with the enterprise; (4) The defendant agreed that he or one or more of the coconspirators would participate directly or indirectly in the conduct of the affairs of the enterprise by agreeing that some member of the conspiracy would commit a pattern of racketeering activity, and (5) That the defendant acted purposely with knowledge of the unlawful objective of the conspiracy charged in the indictment and with an intent to further that objective.
Defendant also argues that the judge erred by not charging the jury that it was their responsibility to decide whether Lombardino's silence at the first trial "was *949 done in furtherance of the main criminal objectives of the conspiracy, or" was merely an act of concealment done after the central objectives were attained. Defendant did not ask the judge to specifically charge the jury that they had to decide whether Lombardino's silence was in furtherance of the conspiracy or whether it amounted to an after-the-fact cover-up. However, defendant stressed at trial that the "overt act . . . in furtherance of the conspiracy" language should be charged.
In her instructions to the jury, the judge instructed that the overt acts embodied in the superseding indictment, including acts four and five that alleged Lombardino's refusal to testify and his communication with defendant at the first trial, must have been done
[I]n an effort to effectuate and perpetuate certain rules of the Colombo Crime Family and "the New Jersey Colombo Crew", to conceal from law enforcement authorities the identity of the said Ray Cagno as a member of the Colombo Crime Family and as having been involved in the murder of James V. Randazzo, and to provide reassurance to the said Ray Cagno of the on-going nature of the racketeering conspiracy.
As noted above, the jury was also charged that "proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality or existence of a conspiracy after January 2nd [1998], must be found," and that the State "must prove beyond a reasonable doubt" that the conspiracy continued after that date.[10]
We find no reversible error by the judge's failing to expressly charge that the jury must find that Lombardino's silence be in furtherance of the conspiracy "as opposed to" or "as compared with" a post-conspiracy cover-up. The charge as a whole clearly instructed that the jury had to find the conspiracy continued until within the five year limitation period.[11]
In so holding, we reject defendant's contention that his Sixth Amendment right to confrontation and hearsay rule N.J.R.E. 803(b)(5) were violated when the judge admitted testimony from an FBI agent and a sheriff's officer that Lombardino did not answer questions about the Randazzo murder at the first trial and that Lombardino was held in contempt, and when these witnesses were permitted to testify about Lombardino's words and gestures to defendant at the first trial.[12] Clearly, the proofs were introduced as evidence of a conspiracy and not for "the truth of the matter asserted." N.J.R.E. 801. See State v. Long, 173 N.J. 138, 152, 801 A.2d 221 (2002); State v. McKiver, 199 N.J.Super. 542, 545, 547-48, 489 A.2d 1256 (App.Div.1985). See also, e.g., United States v. Saada, 212 F.3d 210, 218 n. 8 (3rd Cir.2000). As to the confrontation clause, see also State v. Nyhammer, 197 N.J. 383, 388-89, 963 A.2d 316 (2009) (no confrontation problem when no endeavor to cross-examine); State ex rel. J.A., 195 N.J. 324, 342-43, 949 A.2d 790 (2008) (no confrontation *950 problem when evidence not testimonial); N.J.R.E. 804(c)(5). We also note that Lombardino was not called to testify before the jury at either trial. See State v. Burns, 192 N.J. 312, 333-34, 929 A.2d 1041 (2007).

VII.
Defendant contends that "the jury charge on conspiracy to commit racketeering was legally incorrect and violated" his due process rights because "it failed to require the jurors to reach a unanimous verdict on the alleged racketeering acts." He maintains that "because there was `a genuine possibility' that defendant's conviction for conspiracy to commit racketeering was the `result of different jurors concluding that . . . defendant committed conceptually distinct acts,' . . . that [racketeering conspiracy] conviction must be reversed."
A "[p]attern of racketeering activity" requires "[e]ngaging in at least two incidents of racketeering conduct" that "embrace criminal conduct" and are "interrelated." N.J.S.A. 2C:41-1(d). See also Franklin Med. Assocs. v. Newark Pub. Sch., 362 N.J.Super. 494, 513, 828 A.2d 966 (App. Div.2003). Defendant, however, was not charged with, or convicted of, the substantive crime of racketeering, in violation of N.J.S.A. 2C:41-2, but with conspiracy to violate that section in violation of N.J.S.A. 2C:41-2(d) and N.J.S.A. 2C:5-2.
Given the nature of a racketeering conspiracy proscribed by N.J.S.A. 2C:41-2(d) and its federal analog, 28 U.S.C.A. § 1962(d), there was absolutely no need for the judge to specifically instruct the jury that they had to reach a unanimous verdict on the racketeering acts. In Yannotti, the Second Circuit stated that in Persico, supra, 832 F.2d at 713, it emphasized that "the agreement proscribed by section 1962(d) is [a] conspiracy to participate in a charged enterprise's affairs, not [a] conspiracy to commit predicate acts." Yannotti, supra, 541 F.3d at 121. Further expounding on this point, the Yannotti court continued:
To establish a RICO conspiracy, the government must prove that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. However, in Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the Supreme Court made clear that to establish this pattern, the government need not prove that the defendant himself agreed that he would commit two or more predicate acts. See id. at 64, 118 S.Ct. 469 (noting that, although the RICO statute "broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove [that] each conspirator agreed that he would be the one to commit two predicate acts"). Indeed, Salinas held that to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme. See id. at 63, 118 S.Ct. 469; see also United States v. Ciccone, 312 F.3d 535, 542 (2d Cir.2002) (stating that "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts . . . to be found guilty of the racketeering conspiracy, for it suffices that he adopt [] the goal of furthering or facilitating the criminal endeavor" (internal citations and quotations marks omitted)).
It is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts *951 evincing participation were not outside of the scope of the illegal agreement. "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." Salinas, 522 U.S. at 63-64, 118 S.Ct. 469 (internal citation omitted); see also United States v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000) (holding that "no rule" requires "the government to prove that a [RICO] conspirator knew of all criminal acts by insiders in furtherance of the conspiracy" as long as it shows that defendant possessed knowledge of "the general contours of the conspiracy"); United States v. Rastelli, 870 F.2d 822, 828 (2d Cir.1989) (stating that a defendant may agree to join a RICO conspiracy without knowing the identities of "all the other conspirators" and without "full knowledge of all the details of the conspiracy").
[Id. at 121-22.]
The court added that "to secure Yannotti's conviction for RICO conspiracy, the government was not required to prove the actual commission of a single predicate act by Yannotti or any other conspirator" and that "[t]he underlying predicate acts are relevant merely to establish the existence of the charged agreement among members of the conspiracy to conduct the affairs of the enterprise through a pattern of racketeering conduct and do not constitute separate criminal objectives." Id. at 129.
As previously developed, defendant was likewise charged with racketeering conspiracy. He was charged with a violation of N.J.S.A. 2C:41-2(d) and N.J.S.A. 2C:5-2, "racketeering conspiracy," not with a substantive violation of chapter 41. See N.J.S.A. 2C:41-2(d). Thus, there was no obligation upon the State to prove the actual commission of an act in violation of chapter 41, and a charge that the jury had to unanimously find the commission of racketeering acts in violation of chapter 41 was unnecessary. See also United States v. Gotti, 451 F.3d 133, 137 (2d Cir. 2006) (requiring unanimity "as to each of two predicate acts" to sustain a substantive RICO violation, as compared with RICO conspiracy).
Here, the judge told the jury that the racketeering acts charged by the State were "[c]onspiracy to commit murder, murder, criminal usury (loansharking), operating illegal gambling businesses, illegal lotteries, and possession and distribution of video gambling machines and devices." She also instructed that "[i]nvolvement in at least two incidents of racketeering conduct must be proven beyond a reasonable doubt in order to establish a pattern of racketeering activity." However, she further instructed that
In order for you to find the defendant guilty of the crime of conspiracy to commit racketeering, the State need not prove the defendant actually committed the crime of racketeering; rather, the State must prove beyond a reasonable doubt that the defendant, with the purpose of promoting and facilitating the commission of the crime of racketeering, agreed with at least one other person referred to in the indictment that one of them would commit the crime of racketeering or an attempt to or a solicitation to commit the crime of racketeering, or agreed to aid such other person or persons in planning or commission of the crime of racketeering.
The judge also instructed that, because "this is a criminal case, your verdict, whatever it may be, must be unanimous. That is, all 12 of you must decide whether the *952 defendant is guilty or not guilty." The jury was further instructed that if they unanimously found defendant guilty of the racketeering charge they had to indicate whether at least one of the racketeering acts found was murder. They were specifically told that the answer to that question must be unanimous.[13]
As defendant was charged with racketeering conspiracy, we hold the judge did not have to instruct the jury that it had to unanimously find the actual commission of racketeering acts or agree as to the commission of two such predicate acts.

VIII.
We agree with the trial judge that defendant was properly sentenced as a first degree offender on the racketeering conspiracy. N.J.S.A. 2C:5-4(a), the general statute pertaining to grading of criminal attempt and conspiracy, provides in part:
a. Grading. Except as provided in subsections c. and d., an attempt or conspiracy to commit a crime of the first degree is a crime of the second degree; except that an attempt or conspiracy to commit murder or terrorism is a crime of the first degree, . . . Otherwise . . . conspiracy is a crime of the same degree as the most serious crime which is the object of the conspiracy . . .
Defendant was not convicted of conspiracy to commit murder. He was convicted of racketeering conspiracy in violation of N.J.S.A. 2C:41-2(d). N.J.S.A. 2C:41-3(a), the specific statute pertaining to grading of racketeering offenses, provides:
Any person who violates any provision of N.J.S.[A.] 2C:41-2 in connection with a pattern of racketeering activity which involves a crime of violence, a crime of the first degree or the use of firearms shall be guilty of a crime of the first degree. All other violations of N.J.S[.A.] 2C:41-2 shall be crimes of the second degree.
N.J.S.A. 2C:41-2(d), which makes it unlawful "for any person to conspire as defined by N.J.S.[A.] 2C:5-2, to violate any of the provisions of [N.J.S.A. 2C:41-2]," is a provision within that section.
It is a settled canon of statutory construction that "where there is any conflict between a general and specific statute covering a subject in a more minute and definite way the latter will prevail over the former." In re Mun. Court of the Borough of E. Newark, 390 N.J.Super. 513, 519, 915 A.2d 1116 (Law Div.2006) (quoting Ackley v. Norcross, 122 N.J.L. 569, 6 A.2d 721 (Sup.Ct.1939), aff'd, 124 N.J.L. 133, 11 A.2d 106 (E. & A.1940)). In the special verdict, the jury found that "at least one of the racketeering acts . . . involved murder," a first-degree crime. See N.J.S.A. 2C:11-3(b). See also State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005) (jury fact finding). N.J.S.A. 2C:41-3(a), by incorporating the provisions of N.J.S.A. 2C:41-2, classifies racketeering conspiracies involving violence, crimes of the first degree (including murder) or the use of firearms as crimes of the first degree.

IX.
We briefly address some points raised in defendant's pro se supplementary brief which were not addressed by counsel.
First, defendant challenges the superseding indictment because it did not specify that the racketeering enterprise had to "affect trade or commerce within New Jersey." See State v. Casilla, 362 N.J.Super. 554, 563-66, 829 A.2d 1095 (App.Div.), certif. denied, 178 N.J. 251, 837 A.2d 1093 (2003). He alternatively argues *953 that the judge "committed reversible error by constructively amending the indictment" to so provide when charging the jury.
The superseding indictment charges the existence of an "enterprise which was engaged in, and the activities of which affected trade and commerce" taking place between the mid 1980's and June 2002 "at the Borough of Kenilworth and at the Township of Union, both in the County of Union, at the Borough of Tinton Falls and at the Borough of Freehold, both in the County of Monmouth, elsewhere, and within the jurisdiction of this Court."
The superseding indictment also refers to defendant, Lombardino, Randazzo, and "other persons" as "New Jersey crew members of the Colombo Crime Family of La Cosa Nostra" otherwise referred to as "the New Jersey Colombo Crew." As part of the pattern of racketeering activity, the superseding indictment charged the commission of murder and other crimes "in violation of the laws of the State of New Jersey," and the overt acts were alleged to occur in Kenilworth, the place of Angellino's murder, Tinton Falls, the place of Randazzo's murder, and Union, the place where Lombardino and Rocco met and conversed in January 1994. The indictment sufficiently alleged impact on "trade and commerce" in this state. See State v. Wein, 80 N.J. 491, 497-500, 404 A.2d 302 (1979).
Next, defendant contends that the judge "erred in admitting the January 20, 1994 taped conversation between Lombardino and Rocco." He also contends that "due to the inflammatory content of that tape" his convictions should be reversed. Defendant argues that Lombardino's Sixth Amendment rights were violated because Lombardino was represented by counsel at the time of the taping and that such was known by AUSA Rufolo. Defendant also claims standing as an "alleged coconspirator with a `participatory interest.'" We reject these arguments. Defendant had no right to assert any right or privilege of the co-defendant or co-conspirator. See State v. Baum, 199 N.J. 407, 416-20, 972 A.2d 1127 (2009) (following federal law and rejecting third party standing with respect to Fifth Amendment rights); see also United States v. Sims, 845 F.2d 1564, 1568 (11th Cir.), cert. denied, 488 U.S. 957, 109 S.Ct. 395, 102 L. Ed 2d 384 (1988), (a defendant has no standing to assert the Sixth Amendment rights of a co-conspirator). Cf., State v. Clausell, 121 N.J. 298, 324, 580 A.2d 221 (1990) (standing to challenge to an out-of-court identification of a co-defendant).[14]
Next, defendant contends that his federal plea agreement was breached after his racketeering conspiracy plea with respect to the Angellino murder because that murder was used "by the very same prosecutor" as a predicate act in this case.
As already noted, on November 27, 1995, defendant pled guilty to a racketeering conspiracy charge involving Angellino's murder in the Eastern District of New York. On April 22, 1996, he moved to withdraw that plea. He was concerned that his New York conviction would be used as a predicate act for a federal RICO charge in New Jersey.
In December 1996, a "supplemental plea agreement" was reached whereby defendant agreed to withdraw and not refile his motion to withdraw his Eastern District plea. Paragraph two of that supplemental agreement provided that the United States *954 Attorney's Office for the District of New Jersey ("New Jersey") agreed:
[T]hat as it relates to the potential indictment of the defendant for his alleged involvement in the murder of James Randazzo or other criminal activity on or about May 17, 1993, it will not introduce into evidence at trial or in the grand jury against the defendant in any manner, including but not limited to as an admission, as a prior bad act or as a RICO predicate act, the defendant's (a) guilty plea allocution to the above-captioned indictment, (b) conviction on that charge, and (c) statements to the Probation Department. However, New Jersey reserves the right to offer such evidence if, and only if, the defendant takes the stand and testifies in a manner that is inconsistent with his plea allocution to the above-captioned indictment. New Jersey agrees that it will not indict Cagno without first obtaining evidence that it does not presently have. Such additional evidence could include, but is not limited to, testimony from a person presently known to New Jersey who was reluctant or unwilling to testify.
The supplemental agreement's fifth paragraph specifically noted that the "agreement is limited to the United States Attorney's Office for New Jersey and the United States Attorney's Office for the Eastern District of New York and cannot bind other federal, state or local prosecuting authorities" (emphasis added).
The supplemental agreement, by its terms, is not binding upon the New Jersey State prosecution of defendant. While AUSA Rufolo acted on behalf of the State Attorney General's Office in this prosecution, it was a State prosecution. See State v. Barone, 147 N.J. 599, 689 A.2d 132 (1997). See also N.J.S.A. 2C:1-11 (no bar to prosecution). Moreover, defendant's guilty plea allocution to the Eastern District indictment, his conviction on that charge and statements to the federal probation department were not introduced during his State trial.
Finally, defendant contends that the prosecutor improperly vouched for Rocco at various times and referred to his "truthful testimony." Defendant also complains that the prosecutor made himself a witness by using the phrase "I submit" "over eighty times during the course of his summation." It may very well be "poor practice for . . . prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun `I' [because s]uch a practice runs the risk that the words that follow will convey the personal view of the prosecutor to the jurors." United States v. Walker, 155 F.3d 180, 189 (3d Cir.1998). Nevertheless, as the Walker court wrote:
The second part of the AUSA's remark during closing consists of the statement, "I submit to you that they have no motivation to lie to you. I submit to you that you can determine, using your common sense and your judgment, you can determine the credibility of those two [witnesses]. . . ." The phrase "I submit to you that," without more, does not constitute vouching. Submit means "to commit to the discretion of another," or "to yield to the will of another," or "to present for determination; as an advocate submits a proposition for the approval of the court." BLACK'S LAW DICTIONARY 1278 (5th ed.1979). Thus, the phrase "I submit to you that," is merely a method of prefacing an argument and does not by itself constitute vouching. The phrase fails to meet the vouching standard because it does not assure the jury that the witness is credible, but instead asks the jury to find that the witness was credible. This is proper argument.

*955 [Id. at 188.]

X.
We conclude that the other points raised in defendant's briefs are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
The judgment of conviction and sentence are affirmed.
NOTES
[1] Lombardino was known by the nickname "Tutti."
[2] On November 11, 1998, Judge Politan signed a consent order that vacated the contempt order.
[3] With respect to the murder charge, the judge instructed the jury that it could find defendant guilty as a principal or an accomplice.
[4] The defendant asserts the first indictment should have been dismissed for evidentiary insufficiency because the judge refused to admit evidence of Lombardino's refusal to answer questions before the federal grand jury and at a subsequent deposition in 1998 regarding the Randazzo murder.
[5] Of course, Lombardino's silence was not used against Lombardino.
[6] Taccetta's grant of post-conviction relief for ineffective assistance of counsel was recently reversed by the Supreme Court. State v. Taccetta, 200 N.J. 183, 975 A.2d 928 (2009).
[7] See also N.J.S.A. 2C:1-11 (relating to when a former prosecution in another jurisdiction bars a subsequent prosecution in this state).
[8] We therefore do not have to consider the issue of "continuing jeopardy" because the first trial ended in a mistrial.
[9] A footnote in the opinion added at this point:

Although the issue was not raised on the facts in Persico, it is clear that even when a RICO conspiracy continues into the limitations period, an individual conspirator can commence the running of the statute of limitations as to him by affirmatively withdrawing from the conspiracy. [Id. at 534.]
[10] An inadvertent reference to June 2, 1998, helped defendant.
[11] In light of the tolling provisions of N.J.S.A. 2C:1-6(e), the critical date for limitations purposes may have been in 1995, five years before the original indictment was returned. We need not consider that issue, however, because of the judge's instructions regarding the critical date to which the conspiracy must have continued and the State's burden of proving same.
[12] The judge, however, refused admission of Lombardino's 1994 federal plea allocution, and in response to a jury question, the judge, with the consent of counsel, advised that Lombardino received testimonial immunity on two occasions during the first trial.
[13] As will be hereinafter noted, this was relevant to the sentencing issue.
[14] Clausell involved the reliability of a voice identification of another. Id. at 324-25, 580 A.2d 221.